**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**Filed 5/20/96**

**TENTH CIRCUIT**

———————————————

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff-Appellee, | ) |
| | ) |
| v. | )　　　　No. 95-3039 |
| | ) |
| BRIAN L. MILLER, | ) |
| | ) |
| Defendant-Appellant. | ) |
| | |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff-Appellee, | ) |
| | ) |
| v. | )　　　　No. 95-3045 |
| | ) |
| MICHAEL RAY HICKS, | ) |
| | ) |
| Defendant-Appellant. | ) |

———————————————

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. No. 94-CR-10058)**

———————————————

No. 95-3039 submitted on the briefs.

Randall K. Rathbun, United States Attorney, and D. Blair Watson, Assistant United States Attorney, Wichita, Kansas, for Plaintiff-Appellee in No. 95-3039.

Michael G. Katz, Federal Public Defender, and Jenine Jensen, Assistant Federal Public Defender, Denver, Colorado, for Defendant-Appellant in No. 95-3039.

D. Blair Watson (Randall K. Rathbun, United States Attorney, with him on the brief), Assistant United States Attorney, Wichita, Kansas, for Plaintiff-Appellee in No. 95-3045.

Timothy J. Henry (David J. Phillips, Federal Public Defender, with him on the briefs), Assistant Public Defender, Wichita, Kansas, for Defendant-Appellant in No. 95-3045.

───────────────────────────

Before **SEYMOUR**, Chief Circuit Judge, and **BRORBY** and **MURPHY**, Circuit Judges.

───────────────────────────

**BRORBY**, Circuit Judge.

───────────────────────────

A jury convicted defendants Brian Lee Miller and Michael Ray Hicks of one count of possession with intent to distribute methamphetamine (18 U.S.C. § 2 and 21 U.S.C. § 841(a)(1)); one count of possession with intent to distribute marijuana (18 U.S.C. § 2 and 21 U.S.C. § 841(a)(1)); and one count of using or carrying a firearm in relation to a drug trafficking crime (18 U.S.C. § 924(c)(1)). The jury also convicted Mr. Miller of one count of being a felon in possession of a firearm (18 U.S.C. §§ 922(g) and 924(a)(2)) and convicted Mr. Hicks of one count of interstate transportation of a stolen vehicle (18 U.S.C. § 2313). Mr. Miller and Mr. Hicks now challenge their convictions, and Mr. Hicks also challenges his sentence. We exercise jurisdiction pursuant to 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291 and vacate Mr. Miller's convictions for using or carrying a firearm in relation to a drug trafficking crime (18 U.S.C. § 924(c)(1)) and being a felon in possession of a firearm (18 U.S.C. §§ 922(g) and 924(a)(2)), and remand his case for resentencing in light of our decision to vacate these convictions. In addition, we reverse Mr. Hicks's conviction for using or carrying a firearm in relation to a drug trafficking crime, vacate his sentence for that offense, and remand for a new trial. We affirm in all other respects.

# I

On March 8, 1994, Mr. Hicks was driving a 1991 Ford Aerostar east on U.S. Highway 54 in Clark County, Kansas, with Mr. Miller in the front passenger seat beside him. The van had Missouri license plates. At 3:11 p.m., Kansas Highway Patrol Officer Tom Kennedy determined, by using radar, that Mr. Hicks was going 66 miles-per-hour in a 55 mile-per-hour zone. Trooper Kennedy turned on his lights and stopped the van for speeding. While Trooper Kennedy was pulling the van over, he noticed Mr. Hicks and Mr. Miller "both started talking back and forth to each other" and had "worried look[s]." After they reached the side of the road, Trooper Kennedy walked to the driver side of the van, told Mr. Hicks he had stopped him for speeding and asked him for a driver's license, registration, and proof of insurance. Mr. Hicks said he had proof of insurance and registration, and looked through his wallet and then the glove compartment, but was unable to produce either. Mr. Hicks did, however, produce a valid Kansas driver's license. Trooper Kennedy asked Mr. Hicks who he bought the van from, but Mr. Hicks did not give the person's name. Given the combination of the Missouri license plates, the Kansas driver's license, and Mr. Hicks's statement he had bought the car in California, Trooper Kennedy concluded "probably maybe [Mr. Hicks] stole the vehicle."

Between three and five minutes after he stopped the van, Trooper Kennedy asked Mr. Hicks to step out and walk back to the patrol car. Trooper Kennedy then put Mr. Hicks in the back seat of the patrol car and again asked him where his registration and insurance documents were. Mr. Hicks again looked in his wallet and said he could not find them. Mr. Hicks appeared nervous while he was in the patrol car. When Trooper Kennedy asked Mr. Hicks who owned the van, Mr. Hicks told him he had just bought it, but that the license plates actually belonged to a 1976 Dodge pickup truck

3

he owned, and that he planned to register the van when he reached his destination in Kansas. When Trooper Kennedy asked Mr. Hicks where he was going, Mr. Hicks said he was traveling from Oxnard, California, to Iola, Kansas, to see his ex-wife, bring a present to his daughter, and help Mr. Miller find a job. He also asked Mr. Hicks how long he had known Mr. Miller, and Mr. Hicks said "a long time," and that they had gone to school together. While Mr. Hicks was in the patrol car, Trooper Kennedy checked his license plates and driver's license with the dispatcher. The license plates were current. The registration check on the license plates came back "no record on file," so Trooper Kennedy went back to the van to check the vehicle identification number (VIN).

When Trooper Kennedy returned to the van, he copied the VIN from the driver side doorjamb. The VIN was also on the dashboard, but it was not visible through the windshield because there was a magazine covering it. Trooper Kennedy did not return immediately to his patrol car to check the VIN, but instead put his hands on the driver seat, leaned into the van, and asked Mr. Miller, who was still in the passenger seat, where he and Mr. Hicks were going. Mr. Miller told Trooper Kennedy he was traveling from Ventura, California, which is near Oxnard, California. Trooper Kennedy later testified he questioned Mr. Miller because Mr. Hicks seemed "nervous."

One or two minutes later, at 3:23 p.m., while he was still leaning into the van and talking to Mr. Miller, Trooper Kennedy looked into the ashtray in the center of the dashboard and found a wooden pipe. He recognized it as a drug pipe. Trooper Kennedy did not have to move anything in order to see the pipe. He then returned to his patrol car and asked Mr. Hicks if it was his pipe. Mr. Hicks admitted it was. Trooper Kennedy placed Mr. Hicks and Mr. Miller under arrest for

4

possession of drug paraphernalia in violation of Kansas law and called for backup. Trooper Kennedy also called the VIN into the dispatcher, but it is unclear whether he did so before or after he arrested Mr. Hicks and Mr. Miller. After his backup arrived, Trooper Kennedy learned from the dispatcher that the van was stolen. Mr. Miller, Mr. Hicks, and the van were then taken into custody and brought to the sheriff's station. Trooper Kennedy later performed an inventory search of the van. Among other things, he discovered marijuana, methamphetamine, a glass drug pipe, a loaded Smith & Wesson nine-millimeter semi-automatic handgun, a loaded Multon .380 automatic handgun, zip-lock baggies, and a scale.

Mr. Hicks moved to suppress the evidence Trooper Kennedy found in the van, but the district court denied his motion on the grounds that Mr. Hicks lacked standing to object to the search of the van because he did not have lawful possession of it, and that the length of his detention in the back of the patrol car was reasonable. After a two-day trial, a jury convicted Mr. Hicks and Mr. Miller on all counts, except that it found Mr. Miller not guilty of interstate transportation of a stolen vehicle. The district court sentenced both Mr. Hicks and Mr. Miller to sixty months imprisonment for their violation of 18 U.S.C. § 924(c)(1), to run consecutively with their sentences for the remaining offenses, yielding an aggregate term of imprisonment of 248 months for Mr. Hicks and 322 months for Mr. Miller. This appeal followed.

5

## **II**. Guilt Issues

### A. *Suppression of Evidence*

Prior to trial, both Mr. Hicks and Mr. Miller moved to suppress the evidence found in the van on the grounds that both the search and the duration of the detention were unreasonable under the Fourth Amendment. Mr. Miller later withdrew his motion, but Mr. Hicks did not. The district court held a hearing and denied Mr. Hicks's motion on several grounds in a written order. Mr. Hicks now challenges that decision. He first contends the district court erred when it concluded he lacked standing to challenge the search of the van on Fourth Amendment grounds. "On appeal from the denial of a motion to suppress, we view the evidence in the light most favorable to the district court's ruling, and will uphold the district court's factual findings unless they are clearly erroneous." *United States v. Marchant*, 55 F.3d 509, 512 (10th Cir.), *cert. denied*, 116 S. Ct. 260 (1995). "The questions of standing and the reasonableness of a search under the Fourth Amendment are questions of law subject to de novo review." *United States v. Betancur*, 24 F.3d 73, 76 (10th Cir. 1994).

The issue of standing is "'invariably intertwined' with substantive Fourth Amendment analysis." *Betancur*, 24 F.3d at 76. In deciding whether a defendant has standing, "the inquiry focuses on whether there has been a violation of the Fourth Amendment rights of the particular defendant who is seeking to exclude the evidence." *Id.* To show that a particular search violated his Fourth Amendment rights, the defendant must prove he "has manifested a subjective expectation of privacy in the area searched and [that] that expectation is one society would recognize as objectively reasonable." *Id.*; *see also Marchant*, 55 F.3d at 512-13; *United States v. Benitez-Arreguin*, 973 F.2d 823, 827 (10th Cir. 1992). The mere fact an individual has physical possession of a vehicle does not

6

necessarily give that person a reasonable expectation of privacy in it. *United States v. Arango*, 912 F.2d 441, 444 (10th Cir. 1990), *cert. denied*, 499 U.S. 924 (1991). Rather, he has no reasonable expectation of privacy unless he proves he had lawful ownership or possession of the vehicle at the time of the search. *Betancur*, 24 F.3d at 76-77; *Arango*, 912 F.2d at 445-446; *United States v. Erwin*, 875 F.2d 268, 270 (10th Cir. 1989).

It is undisputed that the van was stolen from an automobile dealership in Oxnard, California, approximately three months before Trooper Kennedy stopped Mr. Hicks in Kansas. Mr. Hicks nevertheless contends the district court erred when it found he was not in "lawful possession" of the van. According to Mr. Hicks, the district court should have relied on his testimony that he did not steal the van, that he did not know the van was stolen until after his arrest, and that he purchased it for $1,600 from one Richard Holiday in Oxnard, California, a few days before Trooper Kennedy stopped him. We disagree. Mr. Hicks did not produce any documentary proof of ownership or lawful possession, nor did he support his position by introducing testimony from Mr. Holiday or any other witness. The only evidence he introduced in support of his position was his own testimony during the suppression hearing. The district court was free to weigh Mr. Hicks's testimony together with the other evidence introduced at the suppression hearing in reaching its decision. It was also free to evaluate Mr. Hicks's credibility and to disregard his testimony if it found his credibility to be lacking. That is precisely what the district court did in this case. It specifically found Mr. Hicks's "explanation regarding his acquisition of the van was not credible."

In light of the evidence introduced during the suppression hearing, the district court's

7

credibility determination was by no means clear error. *See United States v. Ibarra*, 955 F.2d 1405, 1409 (10th Cir. 1992) (credibility determination at suppression hearing reviewed for clear error). Indeed, the Supreme Court has observed in a comparable context that when a case rests entirely on oral testimony, the district court's credibility determinations, "if not internally inconsistent, can virtually never be clear error." *Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985). As noted above, Mr. Hicks admits the van was stolen from an automobile dealership in Oxnard, California, approximately three months before Trooper Kennedy stopped him in Kansas. Despite Trooper Kennedy's request, Mr. Hicks was unable to produce proof of registration. Mr. Hicks was also unable to produce the individual from whom he supposedly purchased the van. In light of this evidence, we find no fault with the district court's ultimate finding Mr. Hicks was not in lawful possession of the van and that he lacked standing to object to the search.

Next, Mr. Hicks concedes Trooper Kennedy acted reasonably when he stopped the van for speeding, but contends "[t]he extended detention and search went well beyond the scope of the initial stop of the van, and was not supported by the evidence." According to Mr. Hicks, at the time Trooper Kennedy instructed him to walk back to his patrol car, "[n]o reasonable or articulable suspicion existed ... to suspect any illegal activity, and [Trooper] Kennedy was only entitled to limit his detention to determine whether Hicks was the true owner of the van, or lawfully in possession of it" by going to the van, copying the VIN, returning to his patrol car, and radioing this dispatcher to determine who owned the van. Therefore, Mr. Hicks contends, any evidence Trooper Kennedy obtained after he exceeded the lawful purpose of the detention was fruit of the poisonous tree and should have been suppressed.

8

Although Mr. Hicks lacks standing to object to the search of the van, he has standing to object to his detention. *Betancur*, 24 F.3d at 77; *Arango*, 912 F.2d at 446. If a detention was illegal, evidence obtained as a result of that illegal detention must be excluded to the extent it was fruit of the poisonous tree. *Id.* We have no difficulty concluding Trooper Kennedy acted reasonably up to and including the point when he obtained the VIN. The initial questioning while Mr. Hicks was in the car presents no Fourth Amendment problem. *United States v. Guzman*, 864 F.2d 1512, 1519 (10th Cir. 1988) ("An officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation"), *overruled on other grounds, United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995) (en banc), *petition for cert. filed* (No. 95-8121) (Mar. 1, 1996). If the driver produces a valid license and proof he is entitled to operate the vehicle, he "must be allowed to proceed on his way, without being subject to further delay by police for additional questioning." *Id.* Trooper Kennedy asked Mr. Hicks for proof of registration, but Mr. Hicks could not comply. At this point, Trooper Kennedy had reasonable suspicion the van might be stolen, which justified further investigation. *United States v. Fernandez,* 18 F.3d 874, 879 (10th Cir. 1994) (citing cases illustrating, as a "defining characteristic of our traffic stop jurisprudence," that "a defendant's lack of a valid registration, license, bill of sale, or some other indicia of proof to lawfully operate and possess the vehicle in question [gives] rise to objectively reasonable suspicion that the vehicle may be stolen."). It was also reasonable for Trooper Kennedy to order Mr. Hicks out of the van, *Pennsylvania v. Mimms*, 434 U.S. 106, 108-11 (1977) (per curiam), and, in light of his reasonable suspicion, to briefly detain Mr. Hicks in the back of the patrol car while he completed his investigation. Assuming for the sake of discussion that Mr. Hicks has standing to object to Trooper Kennedy's minimal "search" of the driver side door to obtain the VIN, we have no trouble concluding

9

Trooper Kennedy acted reasonably when he did so. A driver who has committed a traffic violation does not have a reasonable expectation of privacy in his vehicle's VIN, even if it is not in plain view. *New York v. Class*, 475 U.S. 106, 113-14 (1986). If the VIN is visible from outside the vehicle, the officer cannot enter the vehicle to read it. *Id.* at 119. If the VIN is not visible and the driver is inside, the officer must ask the driver to remove any obstruction and allow him to see the VIN. *Id.* at 115. If, as in this case, the VIN on the dashboard is covered and the driver is not in the vehicle, the officer may open the door to read the VIN on the doorjamb, just as Trooper Kennedy did, he may ask the passenger to remove the obstruction, or he may reach into the vehicle to remove any obstruction covering the VIN on the dashboard. *Id.* at 118-19.

Once Trooper Kennedy lawfully obtained the VIN, it became inevitable he would discover the van was stolen, which in turn would give him probable cause to arrest Mr. Hicks and Mr. Miller, impound the van and perform an inventory search. Therefore, even if we accept Mr. Hicks's position for the sake of argument, it is simply irrelevant whether Trooper Kennedy deviated from his lawful purpose when he leaned into the van, questioned Mr. Miller, and discovered the wooden drug pipe. "[I]f evidence seized unlawfully would have been inevitably discovered in a subsequent inventory search, such evidence would be admissible." *Ibarra*, 955 F.2d at 1410; *see also United States v. Horn*, 970 F.2d 728, 732 (10th Cir. 1992). The district court was therefore correct to deny Mr. Hicks's motion to suppress the evidence discovered in the van.

B. *Jury Instructions*

Mr. Hicks contends the district court's jury instructions inadequately defined the "beyond a

reasonable doubt" standard of proof, thereby violating his Fifth Amendment right to due process and his Sixth Amendment right to trial by jury. *See Victor v. Nebraska*, ___ U.S.___, ___, 114 S. Ct. 1239, 1243 (1994); *Sullivan v. Louisiana*, 508 U.S. 275, ___, 113 S. Ct. 2078, 2081 (1993). The sufficiency of a district court's reasonable doubt jury instruction is a question of law we review de novo. *United States v. Conway*, 73 F.3d 975, 980 (10th Cir. 1995). The district court gave the following jury instruction:

> A reasonable doubt is a fair doubt based on reason and common sense and arising from the state of the evidence. It is rarely possible to prove anything to an absolute certainty, but at the same time, a defendant is not to be convicted on mere suspicion or conjecture. You are instructed that a reasonable doubt is a doubt that would make a reasonable person hesitate to act in the graver and more important transactions of life.

> A reasonable doubt may arise not only from the evidence produced, but also from the lack of evidence. Since the burden is always on the prosecution to prove the accused guilty beyond a reasonable doubt of every essential element of the crime charged, a defendant has the right to rely upon failure of the prosecution to establish such proof. A defendant may also rely upon evidence brought out on cross-examination of witnesses for the prosecution. The law does not impose upon a defendant the burden or duty of producing any evidence.

Before his case went to the jury, Mr. Hicks objected to the first two sentences of the instruction on the ground they merely define the "beyond a reasonable doubt" standard of proof as lying somewhere between "mere suspicion" and "absolute certainty." Mr. Hicks correctly notes there are several standards of proof lying between these two extremes, including the probable cause, preponderance of the evidence, clear and convincing, and beyond a reasonable doubt standards. Because the instruction fails adequately to pinpoint the "beyond a reasonable doubt" standard's position on this broad continuum, Mr. Hicks contends the jury was left without sufficient guidance regarding the meaning of that standard of proof, and his convictions on all counts should therefore be reversed.

11

"[T]rial courts retain considerable latitude in instructing juries on reasonable doubt." *Conway*, 73 F.3d at 980. "[T]he Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course." *Victor*, 114 S. Ct. at 1243. Rather, "so long as the court instructs the jury on the necessity that the defendant's guilt be proven beyond a reasonable doubt ... the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof." *Id.* We will reverse only if the jury instructions, taken as a whole, do not convey the concept of reasonable doubt to the jury. *Id.* To decide whether the jury instructions adequately convey the concept of reasonable doubt, we must determine whether "there is a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet" the beyond a reasonable doubt standard. *Id.* In doing so,

> we must ... be mindful of the difficulties inherent in any attempt to define the term in great detail or to characterize precisely what sort of doubt must be reasonable. As an abstraction the concept of reasonable doubt is not susceptible to description by terms with sharply defined, concrete meanings. Resort must be to wording or language, the meaning of which will necessarily be colored by the experience of each individual. Thus while the term itself is common and readily associated by most individuals with our criminal justice system, it is unlikely that two persons would supply the same characterization of its meaning.

*United States v. Pepe*, 501 F.2d 1142, 1144 (10th Cir. 1974).

The jury instruction the district court gave in this case, taken as a whole, is constitutionally sufficient. The first paragraph of the instruction is virtually identical to the reasonable doubt instruction we reviewed in *Pepe*, which provided:

> "A reasonable doubt is a fair doubt based upon reason and common sense and arising from the state of the evidence. It is rarely possible to prove anything to an absolute certainty. Proof beyond a reasonable doubt is established if the evidence is

12

such as a reasonably prudent man would be willing to rely and act upon in the most important of his own affairs. A defendant is not to be convicted on mere suspicion or conjecture."

*Id.* at 1143. We concluded in *Pepe* that the instruction as a whole was "adequate to apprise the jury of both the reasonable doubt standard and the presumption of innocence," and was not plainly erroneous. *Id.* at 1144. Furthermore, the Supreme Court has "repeatedly approved" the definition of a reasonable doubt as "a doubt that would cause a reasonable person to hesitate to act," *Victor*, 114 S. Ct. at 1250, and we have specifically endorsed it as well. *United States v. Barrera-Gonzales*, 952 F.2d 1269, 1271, 1273 (10th Cir. 1992); *United States v. Leaphart*, 513 F.2d 747, 749 (10th Cir. 1975); *Pepe*, 501 F.2d at 1144. By adding this phrase as a gloss to the words "reasonable doubt," the district court provided the jury with "a common-sense benchmark for just how substantial such a doubt must be." *Victor,* 114 S. Ct. at 1250*.* Finally, both the First and Seventh Circuits have held instructions defining reasonable doubt as a "fair doubt based upon reason and common sense" pass constitutional muster, *United States v. Campbell*, 61 F.3d 976, 980-81 (1st Cir. 1995), *cert. denied*, ___ S. Ct. ___, 1996 WL 137903 (1996); *United States v. Hall*, 854 F.2d 1036, 1038-39 (7th Cir. 1988), and we agree with our sister Circuits on this point.

C. *Sufficiency of the Evidence*

Both at the close of the government's case in chief and at the close of all the evidence, Mr. Hicks and Mr. Miller moved for judgments of acquittal on all counts pursuant to Fed. R. Crim. P. 29(a), but the district court denied their motions. They now renew their contention that the government presented insufficient evidence to support their convictions beyond a reasonable doubt. In evaluating a challenge to the sufficiency of the evidence,

we review the record *de novo*, and ask only whether, taking the evidence -- both direct and circumstantial, together with the reasonable inferences to be drawn therefrom -- in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt. In order to conclude the evidence was insufficient, as a matter of law, to support a conviction, we must find that no reasonable juror could have reached the disputed verdict.

*United States v. Owens*, 70 F.3d 1118, 1126 (10th Cir. 1995) (quoting *United States v. Williamson*, 53 F.3d 1500, 1514 (10th Cir.), *cert. denied*, 116 S. Ct. 218 (1995)). "'To the extent that the evidence conflicts, we accept the jury's resolution of conflicting evidence and its assessment of the credibility of witnesses.'" *Id.* (quoting *United States v. Sapp*, 53 F.3d 1100, 1103 (10th Cir. 1995), *cert. denied*, 116 S. Ct. 796 (1996)).

### 1. *Constructive Possession of Drugs and Firearms*

Both Mr. Hicks and Mr. Miller contend there was insufficient evidence to support their convictions for possession with intent to distribute methamphetamine (18 U.S.C. § 2 and 21 U.S.C. § 841(a)(1)) and possession with intent to distribute marijuana (18 U.S.C. § 2 and 21 U.S.C. § 841(a)(1)). Mr. Miller also contends there was insufficient evidence to support his conviction for being a felon in possession of a firearm (18 U.S.C. §§ 922(g) & 924(a)(2)). They rely primarily on our decisions holding that if two or more individuals jointly occupy a premises, here the van, the government must present direct or circumstantial evidence individually linking them to the contraband in order to prove constructive possession. *See, e.g., United States v. Mills*, 29 F.3d 545, 549 (10th Cir. 1994) ("In cases of joint occupancy, where the government seeks to prove constructive possession by circumstantial evidence, it must present evidence to show some connection or nexus between the defendant and the firearm or other contraband."). They also rely on our precedents

holding a reasonable jury cannot find a defendant constructively possessed contraband unless the government "proves, through direct or circumstantial evidence knowing 'ownership, dominion or control over the [contraband] and the premises where the [contraband is] found.'" *United States v. Jones*, 44 F.3d 860, 869 (10th Cir. 1995) (quoting *United States v. Hager*, 969 F.2d 883, 888 (10th Cir.), *cert. denied*, 506 U.S. 964 (1992)).

Viewed in the light most favorable to the government, the trial evidence showed the following: Trooper Kennedy found Government's Exhibit 3, a blue glove containing 1.5 grams of marijuana, under the driver's seat within easy reach. He also found Government's Exhibit 2, a wooden drug pipe with marijuana residue, in an open ashtray built into the center of the van's dashboard. Mr. Hicks admitted the wooden pipe was his. Trooper Kennedy also found Government's Exhibit 4, a glass drug pipe with methamphetamine residue, under the carpet behind the passenger seat. Trooper Kennedy found Government's Exhibit 5, a blue bag with a zipper, in the rear of the van on the passenger side. Government's Exhibit 5 contained Government's Exhibits 5A, 5B, 5C, and 5F, packages containing 387.3, 226.3, 42.6, and 117.9 grams of methamphetamine, respectively. Government's Exhibit 5 also contained Government's Exhibit 5D, 224.6 grams of marijuana, and Government's Exhibit 5E, a loaded Smith & Wesson Model 459 nine-millimeter semi-automatic handgun. The firearm was at the very bottom of Government's Exhibit 5, with a towel placed over it, and the drugs on top of the towel.

Trooper Kennedy also found a large black bag containing the following: Government's Exhibit 10, a loaded Multon .380 caliber automatic handgun, Government's Exhibit 8, the box that

the Multon came in (the gun was not inside the box), Government's Exhibit 11, a check made out to Mr. Hicks, Government's Exhibit 7, Mr. Hicks's income tax returns, Government's Exhibit 12, a set of scales with methamphetamine residue, a small spoon, and some zip-lock baggies inside a small Harley-Davidson bag, Government's Exhibit 6, a small black pouch containing Government's Exhibit 6A, a red Mead notebook, and Government's Exhibit 9, a small blue spiral memo book. The black bag also contained clothing and a checkbook with Mr. Hicks's name on it. Trooper Kennedy discovered Government's Exhibit 13, a package containing 156.7 grams of marijuana, hidden under the right rear quarter panel of the van.

Trooper Kennedy also found Government's Exhibit 14, a small black address book, on Mr. Miller's belt. The words "Brian Miller's phone book" were written in pencil on the back. A handwriting expert testified that the same person wrote the numerals in Government's Exhibit 6A, the red Mead notebook, and Government's Exhibit 14, Mr. Miller's address book. The handwriting expert testified, however, that a different person wrote the printing and numerals in Government's Exhibit 9, the small blue spiral memo book. The government presented another expert witness who testified that scales, packaging materials, including baggies and tape, and ledgers are common tools of the drug trade. He also testified two of the items found in the black bag, Government's Exhibits 6A, the red Mead notebook, Government's Exhibit 9, the small blue spiral memo book, contained "drug ledger information." Regarding Government's Exhibit 9, the blue spiral memo book, the expert witness testified:

> [I]t appears to be divided into approximately six accounts, and it has an account heading at the top of each one which possibly identifies an individual or an account for persons. The numbers themselves, in many cases they look like or appear to be

16

possibly a running account total for an individual or persons. Some of the cases you'll see where it appears that the numbers are in a [descending] amount like there have been small amounts of payoff that have come in, then a thicker drawn line which might indicate there has been another front to the individual and then payoffs again.

Like in this account here, there's 125 and then 65 and a drawn line on 60, which would possibly be a balance, a running balance. And that appears for six different accounts in this book and is followed by phone numbers. In the back, there's another one for Wade (phonetic), $895, $875, $825 in a [descending] sequence. Ester (phonetic), $330, $230, $225. Some cases, there is a dollar sign that denotes an actual monetary amount. In other cases, it's just a numerical order.

Regarding Exhibit 6A, the red Mead notebook, the expert witness testified:

It also appears to be -- this has only two pages in this particular memo book that have any writing on them. There's one page on the back that obviously had something torn out where there were some amounts on it, but the two pages with visible amounts, the first one starts with $8,800 profit and it states on the page, "profit." Then there's some additions, $1,000, [$]9,000, $800, for a total of $10,800. And then underneath are some numbers like 4 1/2, 3 1/2, 13 1/2 and an "OZ" that follows, which would mean ounces, and then some halves again, 15 1/2, eventually a one ounce total short.

And it's very, very common in many of the powder form substances of drugs, whether they be methamphetamine or cocaine and some of those types of drugs that they're actually dealt with, marijuana itself is also dealt with in ounce quantities.

On the next page, there is $160 and $4,400, and this $4,400 is the double into the $8,800 profit by two, which are some things that we look for.

We have no difficulty concluding the government sufficiently linked Mr. Hicks to the large black bag containing the Multon .380 caliber automatic handgun, the scales, small spoon, and zip-lock baggies, the red Mead notebook, and the blue spiral notebook. Because the black bag contained Mr. Hicks's personal items, *i.e.*, his tax return, his checkbook, and a check made out to him, it is reasonable to infer the black bag was his. Also, the handwriting expert testified the writing in the red Mead notebook matched Mr. Miller's own writing in his address book, and another expert

17

testified the notebook contained drug sale records. A reasonable jury could infer from the fact that Mr. Miller's drug notebook was inside Mr. Hicks's bag along with the tools of the drug trade that both Mr. Hicks and Mr. Miller were jointly involved in drug distribution. The fact that Mr. Hicks and Mr. Miller were both in constructive possession of the tools of the drug trade contained in the black bag, *i.e.*, the scales, the zip-lock baggies, the red Mead notebook, and the blue spiral notebook, raises a reasonable inference linking them to the drugs contained in the blue bag. The fact there were traces of methamphetamine on the scales found in the black bag strengthens this inference. Finally, the wooden drug pipe with marijuana residue in the van's open ashtray, combined with Mr. Hicks's admission the pipe was his, links him to the small quantity of marijuana in the blue glove under his seat.

We also reject Mr. Hicks's and Mr. Miller's contention we should vacate their convictions for possession with intent to distribute methamphetamine (18 U.S.C. § 2 and 21 U.S.C. § 841(a)(1)) and possession with intent to distribute marijuana (18 U.S.C. § 2 and 21 U.S.C. § 841(a)(1)) because there was insufficient evidence to support the jury's finding they intended to distribute the methamphetamine and marijuana found in the van. In order to convict a defendant of possession with intent to distribute illegal drugs under 18 U.S.C. § 841(a)(1), "the government must prove beyond a reasonable doubt that the defendant knowingly possessed [illegal drugs] with the specific intent to distribute." *Jones*, 44 F.3d at 869. As we stated above, there was sufficient evidence to allow the jury to find Mr. Hicks and Mr. Miller were in constructive possession of the tools of the drug trade contained in the black bag. This evidence justifies an inference they had the specific intent to distribute the methamphetamine and marijuana.

18

We conclude, however, that there is no direct or circumstantial evidence showing Mr. Miller had knowing ownership, dominion, or control over either of the firearms. *See Jones*, 44 F.3d at 869. We faced a similar situation in *Jones*. Ms. Johnson was a passenger in a vehicle being driven by her cousin and codefendant, Ms. Jones, from Los Angeles to Detroit. *Id.* at 865. After they were pulled over in Wyoming, officers discovered 200 kilograms of cocaine in the trunk and in a black suitcase in the back seat. *Id.* at 864. Both Ms. Johnson and Ms. Jones had flown one-way from Detroit to Los Angeles. *Id.* at 865. Ms. Johnson's personal effects were inside another suitcase in the back seat. *Id.* None of her personal effects were inside the suitcase containing the cocaine or inside the trunk. *Id.* Ms. Johnson did not have keys to the vehicle. *Id.* All of the cocaine was inside closed luggage, and there was no discernible smell. *Id.* at 866. We held that although a reasonable jury could conclude Ms. Johnson may have suspected illegal activity, no reasonable jury could have concluded beyond a reasonable doubt that Ms. Johnson knew of the cocaine's presence in the car. *Id.* at 866, 870. We therefore vacated her convictions for conspiracy to possess cocaine with intent to distribute (21 U.S.C.§§ 841(a)(1) & 846) and possession with intent to distribute cocaine (21 U.S.C. § 841(a)(1) & 18 U.S.C. § 2).

In this case, the fact the drug sale record book was in the same bag with the tools of the trade raises a reasonable inference he and Mr. Hicks were jointly involved in the drug distribution and links Mr. Miller to the drugs and drug paraphernalia in the black and blue bags. Although we can infer that the black bag belonged to Mr. Hicks because his personal belongings were inside, the blue bag contained none of Mr. Miller's belongings and the black bag did not contain sufficient belongings of Mr. Miller to suggest his awareness of a firearm. In addition, contrary to the

government's assertion, any "nervousness" Mr. Miller may have shown when Trooper Kennedy pulled the van over would have been quite understandable given that he was aware of the drugs contained in the two bags; it does not specifically show that he knew about the firearms. The only real difference between *Jones* and this case is that there is sufficient evidence from which a reasonable jury could infer that Mr. Miller was aware of and involved in part of Mr. Hicks's illegal activity, namely, the transportation and distribution of drugs. For a jury to conclude Mr. Miller was aware of the firearms, however, it would have to draw yet another inference: that because Mr. Miller was aware the bags contained drugs and drug paraphernalia, he also must have known they contained firearms. While it is true, at least as a general principle, that drugs and guns often go together, *see United States v. Nicholson*, 983 F.2d 983, 990 (10th Cir. 1993) ("Drug traffickers may carry weapons to protect their merchandise, their cash receipts, and to intimidate prospective purchasers."), we do not believe this general principle, standing alone, would allow a jury to conclude beyond a reasonable doubt that Mr. Miller was aware there were firearms in either of the bags, without evidence that one or both of the bags belonged to him, that he packed either or both of the bags, or any other evidence individually linking him to the firearms. Accordingly, Mr. Miller's convictions and sentences for using or carrying a firearm in relation to a drug trafficking crime and being a felon in possession of a firearm must be vacated.[1]

2. *Convictions for "Using" or "Carrying" a Firearm*

Mr. Hicks contends there was insufficient evidence to support his conviction for using or

---

[1] In light or our conclusion, we have no occasion to consider Mr. Miller's other challenges to these convictions.

carrying a firearm in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1), in light of the Supreme Court's decision in *Bailey v. United States*, ___ U.S. ___, 116 S. Ct. 501 (1995). In *Bailey*, the Supreme Court held that "[t]o sustain a conviction under the 'use' prong of § 924(c)(1), the Government must show that the defendant actively employed the firearm during and in relation to the predicate crime." *Bailey*, 116 S. Ct at 509. In dicta, the Court cited examples of activities that constitute "active employment" and activities that do not. *Id.*, 116 S. Ct. at 508-09. Evidence that the defendant brandished, displayed, bartered, fired or attempted to fire a firearm, or used it to strike another person, will support a jury verdict that the defendant "used" a firearm, as will evidence the defendant made "a reference to a firearm calculated to bring about a change in the circumstances of the predicate offense." *Id.*, 116 S. Ct. at 508. However, without more, evidence of the "inert presence" or "storage" of a firearm "at or near the site of a drug crime or its proceeds or paraphernalia" will not support such a conviction, even though it may be readily available for "intimidation, attack, or defense," or might "embolden or comfort the offender," unless the weapon is "disclosed or mentioned by the offender." *Id.*

We have held that *Bailey* applies retroactively to cases on direct appeal on the date it was decided, December 6, 1995. *United States v. Wacker*, 72 F.3d 1453 (10th Cir. 1995). Here, the record shows Mr. Hicks merely concealed the firearms in the back of the van, which is insufficient to sustain a finding he "used" them within the meaning of 18 U.S.C. § 924(c)(1). *Bailey*, 116 S. Ct. at 509; *Wacker*, 72 F.3d at 1463. Unlike the defendants in *Wacker*, however, who were charged only with "using" firearms, *Wacker*, 72 F.3d at 1464 n. 8, the indictment in this case alleged Mr. Hicks violated 18 U.S.C. § 924(c)(1) both by "using" and by "carrying" firearms. Faced with an identical

21

situation in *Bailey*, the Supreme Court expressed no opinion regarding the appropriate remedy, but instead simply remanded the case to the Court of Appeals with directions to consider whether the "carry" prong of 18 U.S.C. § 924(c)(1) provided an alternative "basis for upholding the convictions." *Bailey*, 116 S. Ct. at 509. We must now address this issue.

If the substantive law allows the jury to convict a defendant for an offense, here a violation of 18 U.S.C. § 924(c)(1), based on either of two alternative grounds, here that Mr. Hicks either "used" or "carried" the firearms, and the district court correctly instructs the jury regarding each ground, we must affirm the conviction if there is sufficient evidence to support it under either of the alternative grounds, even if there is not sufficient evidence to support the conviction under one of them. *Griffin v. United States*, 502 U.S. 46, 58-60 (1991); *United States v. Pace*, 981 F.2d 1123, 1129 (10th Cir. 1992), *cert. denied*, 507 U.S. 966 (1993). This analysis does not apply in this case, however, because the district court instructed the jury it could find Mr. Hicks "used" the firearms merely by concealing them in the van and keeping them readily available for use, which is incorrect under *Bailey*. *Bailey*, 116 S. Ct. at 509; *Wacker*, 72 F.3d at 1463. Because the instruction defining one of the two alternative grounds for conviction was legally erroneous, we must reverse the conviction unless we can determine with absolute certainty that the jury based its verdict on the ground on which it was correctly instructed. *Griffin*, 502 U.S. at 58-60; *Pace*, 981 F.2d at 1130. The reason for this approach is simple: "Jurors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law," *Griffin*, 502 U.S. at 59, and may have intended to convict the defendant on a legally invalid ground, while rejecting the evidence supporting the legally valid one. We may be absolutely certain that the jury did not make such an

22

unwitting error if, for example, there was no evidence whatsoever to support a conviction on the legally erroneous ground, *Pace*, 981 F.2d at 1130, or if the jury rendered a special verdict indicating it rejected the legally erroneous ground.[2]

Here, the jury rendered a general verdict and there was sufficient evidence on which to base a finding Mr. Hicks "used" the firearms under the jury instructions the district court gave. It is therefore possible that the jury convicted Mr. Hicks solely because it found he "used" the firearms merely by concealing them in the van, which directly conflicts with *Bailey*, and that the jury rejected the government's assertion Mr. Hicks "carried" them. We must therefore reverse Mr. Hicks's conviction under 18 U.S.C. § 924(c)(1). This conclusion brings us to a more difficult question: whether we must order a new trial. Our recent decision in *Wacker* is instructive, though not determinative. In *Wacker*, we concluded, in light of *Bailey,* that it was beyond a doubt that there was insufficient evidence to support the jury's finding the defendants charged in counts 2 and 12 of the indictment "used" firearms, *Wacker*, 72 F.3d at 1464, and we emphasized that the indictment did not allege the defendants "carried" firearms, *id.* at 1464 n.8. We therefore reversed these convictions outright without remanding for a new trial. We went on to hold, however, that it was "a closer question whether the government presented sufficient evidence regarding the firearm charged in Count 7," and that "we cannot say how a jury might decide this issue if properly instructed under the

---

[2] The Third Circuit has held that even if the district court's "use" instruction was incorrect in light of *Bailey*, the conviction should nevertheless be affirmed if the jury would almost certainly have convicted under either the "use" or "carry" prongs, or both, had it had been properly instructed regarding the post-*Bailey* definition of those terms. *United States v. Price*, 76 F.3d 526 (3d Cir. 1996). Because the evidence in this case was not sufficiently compelling, we have no occasion to consider whether the Third Circuit was correct to apply such a harmless error analysis.

23

law as defined by *Bailey*." *Id.* at 1464-65. We therefore remanded the case for a new trial on that count, and gave the government an opportunity to obtain a conviction under the correct legal standard. *Id.* at 1465. We acknowledged that "reversal of a conviction on the grounds of insufficient evidence precludes retrial," *id.* at 1465 (citing *Burks v. United States*, 437 U.S. 1 (1978)), but held that rule did not apply to count 7, because we reversed not for "pure insufficiency of evidence," but because "the legal standard under which the jury was instructed and under which the government presented its proof was incorrect." *Id.* at 1465.

In light of *Wacker*, therefore, we will remand for a new trial only if the jury could have returned a guilty verdict if properly instructed. The jury could not have returned a guilty verdict in this case under the "use" prong of 18 U.S.C. § 924(c)(1). The record contains no evidence that Mr. Hicks ever even attempted to remove the firearms from the bags in which they were concealed, or that he mentioned their presence to anyone. As such, the evidence demonstrated nothing but the "inert presence" which the Supreme Court held was insufficient in *Bailey*. *Bailey*, 116 S. Ct. at 508.

We must next determine whether a properly instructed jury could have returned a guilty verdict under the "carry" prong of 18 U.S.C. § 924(c)(1).[3] We defined the word "carry" for the first time in *United States v. Cardenas*, 864 F.2d 1528 (10th Cir.), *cert. denied*, 491 U.S. 909 (1989). In *Cardenas*, we stated that "there is no evidence in the language of [18 U.S.C. § 924(c)] or its legislative history that Congress intended" the word "carries" to have "a different meaning than the

_____

[3] It is undisputed the jury instruction was correct under our pre-*Bailey* decisions.

24

legal meaning in 1968," the year the statute was enacted. *Id.* at 1535 (footnote omitted). We examined the pre-1968 definitions of the word "carry" and concluded that "[t]he legal consensus at the time of enactment of § 924(c) was that possession was a requisite element of 'carrying a weapon in a vehicle'" but that in light of these definitions "when a motor vehicle is used, 'carrying a weapon' takes on a less restrictive meaning than carrying on the person. The means of carrying is the vehicle, itself, rather than the defendant's hands or pocket, and the requirement of possession, the exercise of dominion and control, consonant with the common legal definition of 'carrying a weapon in a vehicle' at the time of the enactment of § 924(c), is precisely what distinguishes 'carrying' from mere 'transportation.' " *Id.* at 1535-56.

Arguably, some of our later decisions could be read as interpreting *Cardenas* as holding that a defendant cannot be convicted under the "carry" prong unless the firearm was within easy reach of the defendant. For example, in *United States v. McDonald*, 933 F.2d 1519, 1526 (10th Cir.), *cert. denied*, 502 U.S. 897 (1991), we affirmed a conviction under the "carry" prong where the defendant was the driver and there was a firearm under the driver's seat of the vehicle pointing butt-end out. Similarly, in *United States v. Cox*, 934 F.2d 1114, 1121 (10th Cir. 1991), we affirmed a conviction under the "carry" prong where a firearm was found on the passenger side floorboard of a vehicle the defendant had been driving. Finally, in *Nicholson*, 983 F.2d at 990, we affirmed a conviction under the "carry" prong where there was a loaded firearm under the driver seat of the vehicle the defendant was driving. Such a narrow interpretation is supported by the facts of *Cardenas*. Mr. Cardenas was the driver of a vehicle involved in drug trafficking. *Cardenas*, 864 F.2d at 1530. During an inventory search, officers found a firearm behind a potato chip bag in an open compartment inches

from the steering wheel and well within Mr. Cardenas's reach. *Id.* Similarly, we stated in *Cardenas* that the definition of "carries" in § 924(c)(1) must be construed "consonant with the common legal definition of 'carrying in a vehicle.' " *Id.* at 1536. The preceding page contains a parenthetical note stating that "carrying a concealed weapon in an automobile requires that the gun be in such proximity to make it immediately available for use" and another parenthetical stating evidence the firearm was "on, under, or behind the seat or cushion, or is between the seat and the cushion, or is on the floor, or in a pocket of the door or even in a receptacle on the running board." *Id.* at 1535.

One of our later cases shows, however, that this narrow reading of *Cardenas* is not correct. In *United States v. Ross*, 920 F.2d 1530, 1532 (10th Cir. 1990), the defendant used his car as a base of operations and sometimes got the drugs he sold to one of his customers, Paula Belew, from the trunk. *Id.* at 1536. The police discovered a firearm and drug paraphernalia in the trunk. *Id.* We held "the jury could have reasonably found that Ross carried the gun with him in his car during and in relation to his drug distribution activities." *Id.* at 1536-37. The only authority we relied on was our statement in *Cardenas* that "when a motor vehicle is used, 'carrying a weapon' takes on a less restrictive meaning than carrying on the person. The means of carrying is the vehicle, itself, rather than the defendant's hands or pocket." *Cardenas*, 864 F.2d at 1536. If the narrow reading of *Cardenas* were correct, and that case held that the government is required to prove that the firearm was in such proximity to the defendant while in the vehicle that it was immediately available for use, *Ross* would have essentially overruled, or at least disregarded, that proximity requirement. This is not the case. Instead, properly interpreted, *Cardenas* held merely that possession and transportation of a firearm in a vehicle constitutes carrying under § 924(c) if the firearm was in effortless reach; it

26

does not stand for the proposition that possession and transportation of a firearm in a vehicle *does not* constitute carrying under § 924(c) if the firearm was *not* in effortless reach. Our decision in *Ross* then supplemented *Cardenas* by holding the government can obtain a conviction under the "carry" prong even without proof the firearm was in effortless reach.

In light of the above, our pre-*Bailey* cases, correctly interpreted, hold that the government is required to prove only that the defendant transported a firearm in a vehicle and that he had actual or constructive possession of the firearm while doing so. The next, and more difficult question, is whether *Cardenas* and its prodigy survive *Bailey*. Although the Supreme Court made it clear its holding in *Bailey* was confined to the "use" prong, it briefly contrasted the "use" and "carry" prongs as follows:

> We assume that Congress used two terms because it intended each term to have a particular, nonsuperfluous meaning. While a broad reading of "use" undermines virtually any function for "carry," a more limited, active interpretation of "use" preserves a meaningful role for "carries" as an alternative basis for a charge. Under the interpretation we enunciate today, a firearm can be used without being carried, *e.g.*, when an offender has a gun on display during a transaction, or barters with a firearm without handling it; and a firearm can be carried without being used, *e.g.*, when an offender keeps a gun hidden in his clothing throughout a drug transaction.

*Bailey*, 116 S. Ct. at 507. Arguably, one could interpret this language as meaning that a conviction under the "carry" prong of 18 U.S.C. § 924(c)(1) cannot stand absent evidence that the defendant physically carried a firearm on his person. However, our sister circuits have defined the "carry" prong more broadly in the wake of *Bailey*. In *United States v. Manning*, 79 F.3d 212, 216 (1st Cir. 1996), the First Circuit declined to "determine the precise contours of the 'carry' prong," but held evidence that the defendant physically carried a firearm in a briefcase was sufficient to support a

conviction. The Second Circuit has held that a driver, as custodian of the vehicle, could be convicted under the "carry" prong because the firearm was within his easy reach, but that a back seat passenger could not. *United States v. Giraldo*, 80 F.3d 667, ___ (2d Cir. Mar. 25, 1996), 1996 WL 138522 at *8-10. The Sixth Circuit has held evidence that the defendant transported a firearm in a vehicle and that the firearm was "within reach and immediately available for use," can provide an adequate factual basis for a guilty plea based on the "carry" prong. *United States v. Riascos-Suarez*, 73 F.3d 616, 623 (6th Cir. 1996). The Seventh Circuit has held that evidence that the defendant transported a firearm in a vehicle, "on his person or within his reach, available for immediate use" will support a conviction under the "carry" prong. *United States v. Baker*, 78 F.3d 1241, 1247 (7th Cir. 1996). The Ninth Circuit has held the government must prove only that the defendant "transported the firearm on or about his or her person" in such a way that it was "immediately available for use." *United States v. Hernandez*, 80 F.3d 1253, ____, No. 95-30007 (9th Cir. Jan. 31, 1996), 1996 WL 34822 at *3. Finally, the Eleventh Circuit has gone so far as to conclude a reasonable jury can convict under the "carry" prong based only upon evidence the defendant used a vehicle as a "drug distribution center" and that he knew there was a firearm in the glove compartment. *United States v. Farris*, 77 F.3d 391, 395-96 (11th Cir. 1996).

We see nothing in *Bailey* that conflicts with our pre-*Bailey* "vehicular carrying" line of cases. To the extent *Bailey* impacts the definition of the "carry" prong at all, it held that "Congress used two terms [i.e., "uses" and "carries"] because it intended each term to have a particular, nonsuperfluous meaning." *Bailey*, 116 S. Ct. at 507. Under our pre-*Bailey* cases, the "carry" prong applies in a great many situations in which the post-*Bailey* definition of the "use" prong would not. For example, there

28

is no indication the defendants in *Ross*, 920 F.2d at 1532, "actively employed" the firearm found in their trunks by showing them to prospective drug customers, brandishing them, threatening or injuring others, or otherwise, and yet we had no difficulty holding there was sufficient evidence that they "carried" the firearms. Furthermore, it should be noted that our pre-*Bailey* definition of the "carry" prong is consistent with the ordinary meaning of the word "carry." The first definition provided in Webster's Third New International Dictionary 343 (1976) states as follows: "to move while supporting (as in a vehicle or in one's hands or arms): move an appreciable distance without dragging; sustain as a burden or load and bring along to another place." To accept the more narrow definition, we would be required to reach the obviously foolish conclusion that the dictionary definition necessarily assumes that the object in question is within reach of the carrier, and that if it is not, the individual is no longer carrying the object, but is doing something else.

Turning specifically to the facts of this case, we must determine whether there is sufficient evidence to support a conviction under the "carry" prong of 18 U.S.C. § 924(c)(1) upon retrial. The large black bag found in the rear of the van contained a firearm as well as Mr. Hicks's income tax returns, a check made out to him, and a checkbook with his name on it. The evidence in the bag links Mr. Hicks to the firearm and supports the inference that he had knowledge of the firearm and therefore exercised dominion and control over it. Mr. Hicks drove the van while the firearm was inside and therefore he transported the firearm. Because Mr. Hicks simultaneously possessed, through dominion and control, and transported a firearm, we conclude that a jury could find that he carried the firearm.

29

A conviction under § 924(c)(1) also requires the government to prove the defendant carried a firearm "during and in relation to" a drug trafficking offense. To establish this nexus, there must be evidence that defendant "*intended* the weapon to be available for use during [a] drug transaction." *Nicholson*, 983 F.2d at 990 (citing *United States v. Mathews*, 942 F.2d 779, 783 (10th Cir. 1991)) (emphasis in original). Specifically, the government must prove the defendant availed himself of the firearm and that the firearm "played an integral role" in a drug trafficking offense. *Id.* The government can prove the firearm was readily accessible and that the defendant availed himself of it "by showing a close proximity between the firearm and the drugs." *United States v. Ramirez*, 63 F.3d 937, 946 (10th Cir. 1995).

In this case, Mr. Hicks concedes that the firearm was in close proximity to the drugs. The black bag found in the rear of the van contained a firearm and scales with methamphetamine residue. The blue bag, also found in the rear of the van, contained 774.1 grams of methamphetamine. A package, found under the right rear quarter panel of the van, contained 156.7 grams of marijuana. From this evidence of proximity of the firearm and drugs, the jury could have found that the firearm was readily accessible and that Mr. Hicks availed himself of the firearm. As a consequence, there was sufficient evidence Mr. Hicks intended the weapon to be available, that he availed himself of the firearm, and that the firearm had an integral role in a drug trafficking offense.

Our analysis indicates there is sufficient evidence for retrial of Mr. Hicks under 18 U.S.C. § 924(c)(1), carrying a firearm during and in relation to a drug trafficking crime. We therefore remand for a new trial on that charge.

30

### 3. *Interstate Transportation of a Stolen Vehicle*

Finally, Mr. Hicks contends we should vacate his conviction for interstate transportation of a stolen vehicle (18 U.S.C. § 2313) because there was not sufficient evidence to support the jury's finding he knew the van was stolen. We disagree. At trial, an employee of Mike Wallace Ford in Oxnard, California, testified that his dealership had purchased the van as a trade-in, that on December 6, 1993, the dealership began repairing the van to prepare it for resale, and when he arrived at the dealership on December 7, 1993, he discovered the van had been stolen. Trooper Kennedy stopped Mr. Hicks in Kansas approximately three months later, on March 8, 1994. At that time, Mr. Hicks admitted he began his trip in Oxnard, California, and had bought the van there. He produced no written proof of registration, nor did he present oral testimony to explain how he obtained the van. Taken together, this evidence supports an inference Mr. Hicks knew the car was stolen.

### III. Sentencing Issues

Mr. Hicks contends the district court erred by calculating his sentence using the guidelines applicable to D-methamphetamine, which yields a higher sentencing range, rather than the guidelines applicable to L-methamphetamine, which yields a lower sentencing range. At trial, the government called Gerald Palomino, a forensic scientist, to the stand. Mr. Palomino testified he had personally examined the powder seized from the van and determined it was methamphetamine. On cross-examination, Mr. Palomino admitted he had not performed any tests to determine whether the methamphetamine was L-methamphetamine or D-methamphetamine. Despite the apparent lack of information, the probation department calculated Mr. Hicks's base offense level using the guideline

31

provisions applicable to D-methamphetamine in his presentence report. In response to Mr. Hicks's objection, the probation department added an addendum to the presentence report. It acknowledged our holding in *United States v. Lande*, 40 F.3d 329, 331 (10th Cir. 1994), *cert. denied*, 115 S. Ct. 1988 (1995), that if a defendant objects to the presentence report on the ground it erred by calculating his sentence on the basis of D-methamphetamine, "[a]t the sentencing hearing, the burden rests on the government to establish by a preponderance of the evidence the type and quantity of methamphetamine involved in the offense." Both the Probation Department and the government stated the government would present evidence at the sentencing hearing showing the methamphetamine was D-type.

During the sentencing hearing, the government admitted that it was aware of Mr. Hicks's objection to his presentence report, and that it bore the burden of proving the methamphetamine was D-type. The government stated it had submitted the methamphetamine to a lab approximately ten days before the sentencing hearing, that as of the date of the sentencing hearing the lab had not yet tested the methamphetamine, and that it was the government's fault the test results were not yet available, because it had failed to telephone the lab to make sure the report would be submitted in a timely fashion. The government also acknowledged its understanding the distinction between D- and L-type methamphetamine "makes a difference of five or six years as to each defendant on which way it goes," took "full blame" for its oversight, and requested a continuance. Mr. Hicks objected to the granting of a continuance to allow the government to obtain a lab report, primarily because the government was placed on notice of his objection to the presentence report at least two weeks before the hearing and had ample time to obtain a lab report. Mr. Hicks instead asked the district

32

court to sentence him on the basis of the evidence then before it, and decline to sentence him using the guidelines applicable to D-type methamphetamine on the ground the government had failed to meet its burden of proof.

The district court admonished the government, but granted a continuance until 1:00 p.m. that day, a delay of approximately three hours. At approximately 1:00 p.m., the government presented a notarized affidavit from Mr. Palomino that it had received by fax at 12:58 p.m. that day. The affidavit, in its entirety, stated as follows:

> I, Gerald Palomino, solemnly affirm, under penalty of perjury that I am a Forensic Chemist for the Kansas Bureau of Investigation and have been so employed for over two (2) years.
>
> I have testified numerous times as an expert in court [sic] of the State of Kansas and of the United States of America. I have testified in the case of *United States of America v. Hicks and Miller*, No. 94-10058-01, 02.
>
> In addition to my identification of Exhibits 5A, 5B, 5C and 5F as being methamphetamine, I have also determined that the methamphetamine is in fact d-methamphetamine in the following amounts and purity:
>
> | | | |
> |----|-------------|------------|
> | 5A | 387.2 grams | 90% purity |
> | 5B | 117.9 grams | 89% purity |
> | 5C | 226.3 grams | 69% purity |
> | 5F | 42.6 grams  | 69% purity |

Mr. Hicks objected to the admission of the affidavit because it was difficult to read, because he could not cross-examine Mr. Palomino or otherwise impeach the accuracy of the affidavit, because the government failed to provide the information contained in the affidavit in a timely fashion despite having ample opportunity to do so, which made it impossible for him to prepare a meaningful response, and because the affidavit lacked sufficient indicia of reliability to support a

33

finding. The district court stated it was within its "total discretion" to order the continuance and admit the affidavit, admitted the affidavit into evidence, and overruled Mr. Hicks's objection to the presentence report.

The district court was correct that it was within its discretion to grant or deny the government's request for a continuance of the sentencing hearing, *United States v. Nelson*, 54 F.3d 1540, 1546 (10th Cir. 1995), and whether to admit Mr. Palomino's affidavit into evidence. *United States v. Davis*, 40 F.3d 1069, 1073 (10th Cir. 1994), *cert. denied*, 115 S. Ct. 1387 & 1806 (1995). Mr. Hicks urges us to conclude the district court abused its discretion for the reasons he offered during the sentencing hearing and remand for resentencing. We decline to do so for two reasons. First and foremost, we find no abuse of discretion. Second, even if we were to agree, for the sake of argument, that the district court abused its discretion both when it ordered the continuance and when it admitted Mr. Palomino's affidavit, there is no indication that Mr. Hicks suffered prejudice. The grounds Mr. Hicks states he would have asserted to impeach the affidavit are flimsy at best. His primary contention is that the quantity and purity calculations in the affidavit do not correspond to the trial evidence. The trial evidence showed the following:

| 5A | 387.3 grams | 90% purity |
| 5B | 226.3 grams | 69% purity |
| 5C | 42.6 grams | 69% purity |
| 5F | 117.9 grams | 89% purity |

This evidence shows only that Mr. Palomino's affidavit misdescribed exhibit 5B as exhibit 5C, exhibit 5C as exhibit 5F, and exhibit 5F as exhibit 5B. The listed quantities and purities are identical, except that the trail evidence showed Government's Exhibit 5A was .1 gram less than

34

indicated in Mr. Palomino's affidavit. Even if Mr. Hicks had demonstrated this minute inconsistency at the sentencing hearing, it would have had no impact on his sentence, because the district court would merely have corrected the error. Also, in light of Mr. Palomino's affidavit, the district court's finding the methamphetamine was D-type was not clear error.

## IV

For the reasons stated, Mr. Miller's convictions for violating using or carrying a firearm in relation to a drug trafficking crime (18 U.S.C. § 924(c)(1)) and being a felon in possession of a firearm (18 U.S.C. §§ 922(g) and 924(a)(2)) are **VACATED** and his case is **REMANDED** for resentencing in light of our decision to vacate certain of his convictions. Mr. Hicks's conviction for using or carrying a firearm in relation to a drug trafficking crime is **REVERSED,** his sentence for that offense is **VACATED,** and the case is **REMANDED** for a new trial on that offense. The convictions and sentences are **AFFIRMED** in all other respects. The mandate shall issue forthwith.