**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 12 1997**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

PEDRO VILLA-CHAPARRO,

      Defendant-Appellant.

No. 96-2115

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. No. CR-94-752-LH)

---

Robert J. Gorence, Assistant United States Attorney (Kelly H. Burnam, Assistant United States Attorney, and John J. Kelly, United States Attorney, on the brief), Las Cruces, New Mexico, for Plaintiff-Appellee.

Ann Steinmetz, Federal Public Defender (William D. Fry, Assistant Federal Public Defender, with her on the briefs), Las Cruces, New Mexico, for Defendant-Appellant.

---

Before PORFILIO, McWILLIAMS, and BALDOCK, Circuit Judges.

---

BALDOCK, Circuit Judge.

---

A jury convicted Defendant Pedro Villa-Chaparro on one count of possession with

intent to distribute more than 100 kilograms of marijuana in violation of 21 U.S.C. § 841(a)(1) & (b)(1)(B). The district court sentenced Defendant to 63 months imprisonment. Defendant appeals his conviction, claiming the district court erred in (1) denying his motion to suppress evidence arising from an illegal stop and detention; (2) denying his motion for a mistrial due to prosecutorial misconduct during trial; and (3) denying his motion to dismiss the indictment based on the prosecution's improper use of the subpoena power. We exercise jurisdiction under 28 U.S.C. § 1291, and affirm.

I.

On November 18, 1994, Officer Steve Harvill of the New Mexico State Police was patrolling Interstate 25 near Truth or Consequences, New Mexico. At approximately 1:00 p.m., Officer Harvill was near mile marker 100 on the edge of the southbound lane facing southeast. He observed a red pickup truck with clear windows traveling in the northbound lane. The sole occupant and driver of the vehicle did not appear to be wearing a seat belt harness in violation of N.M. Stat. Ann. § 66-7-372 (Michie 1978). At the suppression hearing, Officer Harvill testified as follows:

> Q. How was it that you were able to see that the driver wasn't wearing a seat belt?
> A. The distance between the southbound and the northbound lanes isn't that great. It was a bright day. I could see clearly through the windows. . . . I could see through the driver's side door window and through the out -- I guess it would be outside the rear window. There was no camper on it, so the cab of the vehicle was very lit up with the sunlight.
> Q. Were you inside your vehicle or outside of your vehicle?
> A. When I first noticed it, I was outside my vehicle. I had just released a violator and was walking back to my unit to get in my unit. I noticed the

2

vehicle go by, and that's when I saw that he was not wearing a seat belt.

Rec. Vol. III at 42-43. Officer Harvill drove his marked police car across the median and proceeded northbound towards the red pickup truck intending to stop the vehicle and issue its driver a seat belt citation.

At approximately the 102 mile marker, Officer Harvill observed the truck traveling in light traffic between 50 and 55 miles per hour in a 65 miles per hour zone. At this time, the driver was wearing his seat belt harness. Officer Harvill noted that the driver would not look in the truck's side mirrors or rear view mirror. Instead, the driver focused directly in front of him and ignored the officer. Officer Harvill testified why the driver's conduct was significant:

> Q. Tell the court why that fact was significant to you.
> A. Generally, if you get in behind somebody and they notice an officer behind you, you're -- you get a little nervous, you get a little tense, but you want to check your mirrors. You want to see if you're being stopped. They want to know why he's being followed. I do the same thing; if an officer pulls in behind me, I don't know that I'm -- if I was committing a violation, I'm just waiting for him to turn on his red lights. So I'm watching, you know, the mirrors. In my experience, I've noticed that people tend to just watch you constantly. When they're going by you, they're always looking at you, and this subject wouldn't. It kind of made me wonder if there was something more than just a seat belt violation.

Rec. Vol. III at 50-51. At approximately 1:04 p.m., Officer Harvill requested a New Mexico license plate check. After learning that the license plate was for a 1977 Ford pickup truck registered to an Ernesto Gomez, Officer Harvill positioned his car directly behind the truck and activated his flashing red lights. When the driver did not respond,

3

Officer Harvill activated his siren and pulled to the left side of the truck. Only then did the driver of the truck acknowledge the police officer's presence. Officer Harvill stopped the truck at mile marker 107 at approximately 1:10 p.m. Officer Harvill testified that the distance from the time he first activated his lights until the driver responded was over one mile. Rec. Vol. III at 54.

The driver produced a valid driver's license which identified him as Pedro Villa-Chaparro. After producing the vehicle's registration, Villa-Chaparro informed Officer Harvill that an Ernesto Gomez owned the vehicle. When asked the whereabouts of Gomez, Villa-Chaparro responded that he was in Deming, New Mexico. The registration, however, indicated Gomez resided in Las Cruces, New Mexico, some sixty miles from Deming. Officer Harvill informed Villa-Chaparro that he had been stopped for a seat belt violation. When the officer asked Villa-Chaparro about his destination, he responded in broken English that he was going to Socorro, New Mexico, to purchase a hay cutter. On the floorboard of the truck, Officer Harvill noticed a white crystal substance while detecting a strong detergent odor. The officer did not see any detergent box, laundry basket, or clothes. Officer Harvill testified that in his experience, he had seen soap, air fresheners, and like items used as masking agents to hide narcotics. Rec. Vol. III at 63. This initial encounter lasted approximately two minutes.

Because Villa-Chaparro was not the registered owner of the vehicle, Officer Harvill next attempted to locate the VIN on the dashboard through the windshield.

4

Officer Harvill intended to match the VIN plate with the registration and then run the plate through dispatch to determine whether the vehicle was stolen or the VIN altered. When the officer could not locate the VIN on the dashboard, he asked Villa-Chaparro to step out of the truck so he could look for the VIN on the driver's side door. A manufacturer's sticker on the door jam had a VIN which matched the VIN on the registration. Upwards from the bottom of the door was a small VIN plate which also matched the registration. Officer Harvill noticed, however, that the VIN plate on the door did not appear to be factory installed. The plate had extremely large rivets which covered part of the wording on the plate. The paint surrounding the plate was faded indicating the plate had been moved. Officer Harvill testified that the VIN plate on the door indicated the possibility of an altered VIN. Rec. Vol. III at 68.

One additional area where the VIN is located is on the engine. Officer Harvill asked Villa-Chaparro for permission to look under the hood. Villa-Chaparro said yes and opened the hood. Officer Harvill noticed the engine itself was extremely dirty and covered with oil. The engine compartment, namely the hood, fenders, firewall, and area around the radiator and grill, was relatively clean. The bolts attaching the fenders to the firewall appeared altered. Officer Harvill also noticed that the driver and passenger side fenders were different and the chrome bumper had paint overspray. Officer Harvill testified that the alterations in the engine compartment indicated the possibility of stolen parts or a modification to conceal narcotics. Rec. Vol. III at 74-75.

5

Officer Harvill decided to return to his vehicle and obtain a rag with which to wipe off the engine and locate the VIN. As Officer Harvill passed the back of the truck, he noticed the rear frame and fender bowed out slightly. The officer tapped on the fender with his knuckles. Instead of the usual hollow sound, the fender sounded hard and dull. Officer Harvill testified that "[i]t was just like there was something behind it, like maybe they had a constant framework in this bed like a reinforced bed or something." Rec. Vol. III at 82. At that point, Officer Harvill decided to radio a canine unit. At approximately 1:15 p.m., Officer Harvill requested the assistance of a border patrol agent with canine.

At approximately 1:53 p.m., Border Patrol Agent Joel Nickles and his dog Cora arrived on the scene. After speaking briefly with Villa-Chaparro in Spanish, Agent Nickels began his inspection of the truck. Cora alerted on the underneath of the bed near the side panels. Officer Harvill then looked up the wheel well. Numerous bundles of marijuana lined both sides of the bed. A piece of square tubing that appeared welded to the front and rear of the bed held the bundles in place. Officer Harvill located additional bundles on both sides of the truck's front fenders. Ultimately, a total of 297 pounds of marijuana was seized from the vehicle.

## II.

Based upon the foregoing facts, Defendant claims Officer Harvill's stop of the truck and subsequent detention of his person violated the Fourth Amendment.[1] The Fourth Amendment protects individuals from unreasonable seizures by government officials. U.S. Const. amend. IV. The touchstone of the Fourth Amendment is reasonableness. Well established standards govern our review of the district court's determination that Officer Harvill's actions were reasonable.

When reviewing a district court's denial of a motion to suppress, we consider the totality of the circumstances and view the evidence in a light most favorable to the government. E.g., United States v. Wood, 106 F.3d 942, 945-46 (10th Cir. 1997). We accept the district court's factual findings unless those findings are clearly erroneous. Id. Judging the credibility of the witnesses, determining the weight to be afforded the testimony, and drawing reasonable inferences and conclusions from the testimony, are within the province of the district court. E.g., United States v. Toro-Pelaez, 107 F.3d 819, 824 (10th Cir. 1997).

---

[1] Although Defendant lacks standing to object to the search of the truck because he did not prove he had lawful possession of the vehicle at the time of the search, e.g., United States v. Miller, 84 F.3d 1244, 1249-50 (10th Cir. 1996), Defendant does have standing to object to his detention. If a detention is illegal, evidence obtained as a result of that detention generally must be excluded under the fruit of the poisonous tree doctrine. Id. at 1250. Officer Harvill testified at the suppression hearing that Defendant was not free to leave. Rec. Vol. IV at 86, 89.

The district court's ultimate determination of reasonableness under the Fourth Amendment is a question of law reviewable de novo. E.g., United States v. Shareef, 100 F.3d 1491, 1499 (10th Cir. 1996). However, we view the officer's conduct, as must the district court, with "common sense" considering "ordinary human experience." United States v. Sharpe, 470 U.S. 675, 685 (1985). As we stated in United States v. Alvarez, 68 F.3d 1242, 1244 (10th Cir. 1995), cert. denied, 116 S. Ct. 1436 (1996): "This approach is intended to avoid unrealistic second-guessing of police officers' decisions and to accord appropriate deference to the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions." See also United States v. Martinez-Cigarroa, 44 F.3d 908, 912-13 (10th Cir. 1995) (Baldock, J., concurring).

A.

A traffic stop constitutes a seizure under the Fourth Amendment. Our standard for determining the reasonableness of a traffic stop under the Fourth Amendment is well established:

> [A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring. It is irrelevant, for purposes of Fourth Amendment review, whether the stop in question is sufficiently ordinary or routine according to the general practice of the police department or the particular officer making the stop. It is also irrelevant that the officer may have had other subjective motives for stopping the vehicle. Our sole inquiry is whether this particular officer had reasonable suspicion that this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction.

8

United States v. Botero-Ospina, 71 F.3d 783, 787 (10th Cir. 1995) (en banc) (internal quotations and citations omitted), cert. denied, 116 S. Ct. 2529 (1996); accord Whren v. United States, 116 S. Ct. 1769, 1773-77 (1996) (reasonableness of traffic stop does not depend on subjective motivations of officer involved).

In this case, Officer Harvill testified that when Defendant passed by him on the interstate, he did not appear to be wearing a seat belt harness contrary to New Mexico state law. The Officer's uncontradicted testimony established that the distance between his vehicle and Defendant's vehicle was not great, the day was bright and sunny, and he could see clearly through the windows of Defendant's truck. The district court found Officer Harvill's testimony that he stopped Defendant's truck based upon an observed traffic violation credible. Because this finding is not clearly erroneous, we uphold the district court's conclusion that the initial stop of Defendant's truck was reasonable.

B.

Next we address the reasonableness of Officer Harvill's detention of Defendant. Generally a police officer's actions during a detention must be reasonably related in scope to the circumstances which justified the initial stop. Terry v. Ohio, 392 U.S. 1, 20 (1968). An investigative detention usually must last no longer than necessary to effectuate the purpose of the stop. United States v. Lee, 73 F.3d 1034, 1038-39 (10th Cir. 1996). An investigative detention may be expanded beyond its original purpose, however, if during the initial stop the detaining officer acquires "reasonable suspicion," of criminal activity,

9

United States v. Jones, 44 F.3d 860, 872 (10th Cir. 1995), that is to say the officer must acquire a "particularized and objective basis for suspecting the particular person stopped of criminal activity." Wood, 106 F.3d at 946.

In this case, the facts and circumstances were sufficient to justify Defendant's continued detention following the initial stop. Officer Harvill followed Defendant for over a mile with his flashing lights activated while Defendant ignored him. Only after Officer Harvill activated his siren and pulled beside Defendant did Defendant acknowledge the officer's presence and pull over. We have identified a driver's failure to promptly stop an automobile in response to flashing police lights as a factor supporting reasonable suspicion. Jones, 44 F.3d at 872 (citing United States v. Walraven, 892 F.2d 972, 975 (10th Cir. 1989)).

While checking Defendant's license and registration, Officer Harvill noticed soap crystals on the truck's floorboard and detected the odor of detergent. Although the scent of a masking agent alone is insufficient to establish reasonable suspicion, "we have repeatedly held that air freshener coupled with other indicia of criminal activity supports a reasonable brief inquiry . . . . The fact that air freshener [or laundry detergent] may be used innocently does not mean that it cannot be used under other suspicious circumstances." Alvarez, 68 F.3d at 1245-46 (McKay, J., concurring).

Another factor supporting Officer Harvill's reasonable suspicion was that Defendant did not own the truck he was driving. Defendant provided Officer Harvill

10

with a registration which indicated an Ernesto Gomez from Las Cruces, New Mexico, owned the truck. Defendant told the officer that Gomez was in Deming, New Mexico. We have noted that "[o]ne recurring factor supporting a finding of reasonable suspicion . . . is the inability of a defendant to provide proof that he is entitled to operate the vehicle he is driving." United States v. Gonzalez-Lerma, 14 F.3d 1479, 1484 (10th Cir. 1994); accord United States v. Fernandez, 18 F.3d 874, 879 (10th Cir. 1994) ("[D]efining characteristic of our traffic stop jurisprudence is the defendant's lack of . . . some . . . indicia of proof to lawfully operate and possess the vehicle in question, thus giving rise to objectively reasonable suspicion that the vehicle may be stolen.") (listing Tenth Circuit cases).

We have no difficulty concluding that after this initial encounter with Defendant, Officer Harvill was justified in checking the truck's VIN and acted reasonably in doing so. Because (1) Defendant did not stop promptly after signaled to do so, (2) Defendant was not the registered owner of the vehicle, and (3) soap crystals covered the floorboard, the possibility existed that Defendant had stolen the vehicle, was transporting narcotics, or both.

Moreover, the Supreme Court has held that a driver of a vehicle does not have a reasonable expectation of privacy in the VIN, even when the VIN is not in plain view. New York v. Class, 475 U.S. 106, 114 (1986). Because the VIN was not present on the dashboard, Officer Harvill properly asked Defendant to step outside the vehicle so he

11

could check for the VIN on the doorjamb. See United States v. Miller, 84 F.3d 1244, 1251 (10th Cir.), cert. denied, 117 S. Ct. 443 (1996) (where VIN was not visible on dashboard, officer was justified in opening the door to look for VIN on doorjamb).

When Officer Harvill saw that the VIN plate on the doorjamb appeared to have been altered, he was justified in asking Defendant if he could check the VIN on the engine. The appearance of the engine compartment confirmed Officer Harvill's already reasonable suspicion of criminal activity. The engine itself was filthy while the engine compartment was relatively clean. The appearance of the front fenders and the bolts attaching them to the firewall suggested the engine compartment had been modified. The hard dull sound of the rear fender when Officer Harvill tapped on it suggested modification to the bed of the truck as well.

Given the totality of the circumstances, we conclude that Officer Harvill acted reasonably in detaining Defendant for five minutes from the time he stopped Defendant at 1:10 p.m. to the time he requested a canine unit at 1:15 p.m., and for an additional thirty-eight minutes while he waited for the canine unit to arrive. The numerous factors which Officer Harvill noticed during his encounter with Defendant, considered together with Officer Harvill's ability as a trained law enforcement officer to distinguish between innocent and suspicious actions amounted to reasonable suspicion sufficient to justify Defendant's detention and satisfy the Fourth Amendment. See United States v. Betancur, 24 F.3d 73, 78 (10th Cir. 1994) (irregularities in appearance of pickup truck plus driver's

12

inability to provide proof of lawful ownership of vehicle sufficient to establish reasonable suspicion supporting temporary detention).

III.

Defendant next claims that the government's deliberate solicitation of prejudicial testimony and improper rebuttal argument constituted prosecutorial misconduct entitling him to a mistrial. Defendant argues that the government improperly solicited testimony from Officer Harvill at trial regarding Defendant's truthfulness. The following encounter took place:

> Q. All right. And based on his actions, what did you conclude?
> A. I suspected--
> DEFENSE COUNSEL: Objection, Your Honor. There's an improper foundation for this, and it's based on an improper conclusion.
> THE COURT: Sustained.
> Q. What was your reaction to this story?
> A. I didn't believe the story.
> DEFENSE COUNSEL: Objection, Your Honor; that's to be withdrawn from the record.
> THE COURT: You're asking that the answer be stricken?
> DEFENSE COUNSEL: Yes, Your Honor, and that the jury be instructed also.
> THE COURT: The answer will be stricken.

Rec. Vol. V at 29-30. Defendant also argues that the government in closing argument improperly shifted the burden of proof to Defendant by faulting him for failing to draw Officer Harvill a map of his destination and failing to show the jury a picture of his farmland.

In United States v. Gabaldon, 91 F.3d 91, 92-94 (10th Cir. 1996), we clarified the standard of appellate review for alleged prosecutorial misconduct during trial where a defendant objects contemporaneously and later unsuccessfully moves for a mistrial. We held that--

> [W]hen the district court has denied defendant's motion for a new trial or for a mistrial, the defendant may not ignore this determination and seek de novo appellate review of the court's ruling on defense counsel's prosecutorial misconduct objection. Rather, the proper course is for this court to review the denial of defendant's motion under an abuse of discretion standard.

Id. at 94. Applying this standard, we conclude that the district court did not abuse its discretion in denying Defendant's motion for a mistrial based on prosecutorial misconduct.

The government's questions regarding Defendant's truthfulness were improper under Fed. R. Evid. 404(a). We are not prepared to conclude, however, that the government's closing argument was improper given defense counsel's focus in closing argument on Defendant's cooperative nature. See United States v. Janus Industries, 48 F.3d 1548, 1558 (10th Cir. 1995) (considerable latitude given to prosecutor in closing argument where defense counsel "invites" argument). Nevertheless, even assuming that the government's argument was improper, such argument is harmless unless it influenced the jury's verdict. United States v. Ivy, 83 F.3d 1266, 1288 (10th Cir.), cert. denied, 117 S. Ct. 253 (1996). The question for resolution is not the culpability of the government,

but the fairness of the trial. United States v. Kornegay, 885 F.2d 713, 718 (10th Cir. 1989).

We are satisfied that Defendant received a fair trial, albeit not a perfect trial. See United States v. Hasting, 461 U.S. 499, 508-09 (1983) ("[T]here can be no such thing as an error-free, perfect trial, and . . . the Constitution does not guarantee such a trial.). Considering the trial as a whole including "the curative acts of the district court, the extent of the misconduct and the role of the misconduct within the case," United States v. Ramirez, 63 F.3d 937, 944 (10th Cir. 1995) (internal quotations omitted), the alleged misconduct was not so egregious as to influence the jury to convict on improper grounds.

IV.

Finally, Defendant claims that the government's improper use of the district court's subpoena power under Fed. R. Crim. P. 17(a) to conduct ex parte interviews with witnesses warrants dismissal of the indictment against him, or in the alternative, a remand for an evidentiary hearing on the extent of the government's practice.[2] The district court held a hearing on Defendant's motion to dismiss the indictment, but refused to permit

---

[2] Fed. R. Crim. P. 17(a) states in relevant part:

**(a) For Attendance of Witnesses; Form; Issuance.** A subpoena shall be issued by the clerk under the seal of the court. It shall state the name of the court and the title, if any, of the proceeding, and shall command each person to whom it is directed to attend and give testimony at the time and place specified therein. The clerk shall issue a subpoena, signed and sealed but otherwise in blank to a party requesting it, who shall fill in the blanks before it is served.

15

testimony concerning the government's improper use of the subpoena power in cases other than Defendant's. Because Defendant failed to show that the improper service of court-issued subpoenas prejudiced him in any manner, the district court denied the motion. We review the denial of Defendant's motion under an abuse of discretion standard. Gabaldon, 91 F.3d at 93-94.

The record reveals that to compel witnesses to attend ex parte interviews, the United States Attorney's Office in New Mexico improperly served fifty-three subpoenas in eleven cases over a two and one-half year period. In the present case, the United States Attorney's Office improperly served two of those subpoenas on Officers Steve Harvill and Jesse Franco of the New Mexico State Police. Undoubtedly, the government's practice of using the court's subpoena power to compel witnesses to attend ex parte interviews is improper. Courts have consistently interpreted Fed. R. Crim. P. 17(a) to permit the issuance of subpoenas only to compel attendance at formal proceedings such as hearings and trials. E.g., United States v. LaFuente, 991 F.2d 1406, 1411 (8th Cir. 1993).

Nevertheless, dismissal of an indictment as a remedy for government abuse of the court's subpoena power is drastic and surely requires a showing of prejudice to a defendant. Ordering a new trial based on such abuse, while a less drastic remedy than outright dismissal, similarly requires a showing of prejudice. See Gabaldon, 91 F.3d at 94 (motion for new trial based on prosecutorial misconduct requires examination of prejudicial impact of error). In United States v. Crawford, No. 94-5077, 52 F.3d 338,

16

1995 WL 238324 at *1 (10th Cir. Apr. 21, 1995) (unpublished), the only case from this circuit addressing abuse of the subpoena power, we noted that the questions of harm and reversible error escaped defendant's analysis. We concluded: "Assuming subpoenas were improperly altered, defendant has demonstrated no resulting prejudice that would require reversal of his conviction on this ground." Id.

As in Crawford, Defendant in this case has demonstrated no resulting prejudice from the government's improper use of the court's subpoena power that would require dismissal of the indictment or even a remand for an evidentiary hearing. The subpoenas challenged in this case were served on two New Mexico State Police officers. These officers certainly were not hostile to the government and nothing in the record indicates they would not have cooperated with the government absent the subpoenas. Nothing prohibits the government from speaking with its own witnesses prior to trial.

Defendant claims that the "pervasiveness and egregiousness of the government's practice of utilizing illegal subpoenas" requires us to exercise "broad supervisory power" and sanction the government. The Supreme Court, however, has instructed us that "[s]upervisory power to reverse a conviction is not needed as a remedy when the error to which it is addressed is harmless since, by definition, the conviction would have been obtained notwithstanding the asserted error." United States v. Hasting, 461 U.S. 499, 506 (1983). In this case, the government's abuse of the court's subpoena power clearly was harmless. Our refusal to disturb Defendant's conviction on this basis, however, should

17

not be construed as approval of the government's practice. If the government abuses the subpoena power in future cases, the district court certainly may fashion an appropriate remedy to stop the abuse.

Accordingly, for all the foregoing reasons, the judgment of the district court is AFFIRMED.