**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**NOV 2 1998**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

VINCENT JEROME RIDLEY,

    Defendant-Appellant.

No. 97-3319
(D.C. No. 97-CR-40009-01-RDR)
(District of Kansas)

**ORDER AND JUDGMENT**[*]

Before **PORFILIO**, **BRORBY**, and **MURPHY**, Circuit Judges.

Jerome Ridley appeals the district court's denial of his motion to suppress the fruits of a search of his vehicle. He contends the officers' search was beyond the scope of the initial justification for the stop of his car which he maintains was merely to check his license. Because the police stopped Mr. Ridley for suspicion of his participation in a drive-by shooting and not to check his license, we affirm.

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. This court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

On the night of May 21, 1996, the Topeka Police Department set up a "driver's license check lane" in an intersection in Topeka, Kansas. As part of this operation, two police officers were stationed about 200 feet north of the intersection to watch cars as they approached the checkpoint. In particular, these officers were watching for people dropping things or making suspicious movements, and cars making u-turns as the checkpoint came into view.

At about 1:55 A.M., Mr. Ridley drove his black Jeep Cherokee with woodgrain sides toward the intersection. As he crested the hill just north of the intersection the checkpoint came into view. Officers north of the checkpoint became suspicious when Mr. Ridley immediately braked the car and leaned forward holding the steering wheel with his left hand and pushing something under the seat with his right hand. While the officers conceded they could only see Mr. Ridley's upper torso and shoulders, both testified they believed he was concealing something. Finally, both officers believed the Jeep matched the description of a car involved in a recent drive-by shooting.

Earlier that evening at roll call, a bulletin had been read to officers about a brown Jeep Cherokee with woodgrain sides that had purportedly been involved in a drive-by shooting the previous night. The bulletin stated that about 48 hours earlier, a Jeep occupied by four black females was reported to have been involved in an assault about fifteen blocks from the checkpoint intersection. The officers who observed Mr. Ridley's vehicle notified their companions at the checkpoint that the approaching vehicle

resembled the Jeep described in the bulletin and that they believed the driver reached forward "like he was trying to hide something under the seat."

As Mr. Ridley approached the intersection, the officers north of the checkpoint activated their emergency lights and pulled their patrol car behind Mr. Ridley's Jeep. As a checkpoint officer approached the Jeep, one of the officers in the patrol car yelled out of his window that the driver might have a gun. Mr. Ridley was ordered to get out of the Jeep and to walk to the rear of the vehicle with his hands over his head. A patrolman patted down Mr. Ridley but found no weapon.

A second officer entered Mr. Ridley's Jeep from the passenger side and began to search the Jeep. Mr. Ridley repeatedly told officers the Jeep and its contents did not belong to him and also repeatedly objected to the search.

Looking for a weapon, the officer conducting the search opened a plastic container in plain view on the transmission hump near the driver's seat. The container had been within reach of the driver, and was large enough to hold a gun. Inside, the officer found a bag containing cocaine.

Mr. Ridley moved to suppress the cocaine as the fruit of an illegal search. In particular, Mr. Ridley maintained the search was unreasonable and beyond the scope of

the original justification for the stop -- a driver's license check. The court denied the motion and Mr. Ridley appeals.[1]

When reviewing the district court's denial of a motion to suppress, we view the evidence in the light most favorable to the government and accept the district court's factual findings unless clearly erroneous. *United States v. Villa-Chaparro*, 115 F.3d 797, 800-01 (10th Cir. 1997). We review the reasonableness of the search and seizure de novo. *Id.*

To determine whether the officers possessed a reasonable suspicion, we must review the totality of the circumstances. *United States v. Cortez*, 449 U.S. 411, 417 (1981). We should give due weight to the specific reasonable inferences which the officers are entitled to draw from the facts in light of their experience. *Terry v. Ohio*, 392 U.S. 1, 27 (1968).

Mr. Ridley does not challenge the stop per se. Instead, he argues the justification for the stop, a driver's license check, was exhausted and the ensuing search went beyond the scope of that justification. His argument is unavailing.

Where the police have reasonable suspicion based on specific and articulable facts to believe that a driver may be armed and dangerous, they may conduct a protective

---

[1]The government first maintains Mr. Ridley does not have standing to challenge the search of the Jeep. However, because the government failed to press its point at the district court, and it is raised here for the first time, we shall not consider it. *United States v. DeWitt*, 946 F.2d 1497, 1499 (10th Cir. 1991).

search for weapons not only of the driver's person but also of the passenger compartment of the automobile. *Michigan v. Long*, 463 U.S. 1032, 1049 (1983). Here, the district court found three factors providing such suspicion: (1) the "vehicle resembled one identified in a recent local drive-by shooting"; (2) the "driver made furtive gestures as if he were stuffing or reaching for something beneath the car seat"; and (3) the "vehicle approached the checkpoint at a distinctively slow pace." Mr. Ridley challenges the court's interpretation of each of these findings.

Mr. Ridley maintains the police bulletin could not have created a reasonable suspicion because "nothing in the [bulletin] fit with the actual circumstances of the stop -- not the vehicle, not the occupant, not the time and not the location." He argues his vehicle was a black Jeep Wagoneer, not a brown Jeep Cherokee as described in the bulletin. In addition, the police saw only one man in the Jeep; the police bulletin, on the other hand, concerned four females. Although one officer noticed Mr. Ridley was black, two others testified they did not know he was black until he got out of the Jeep; thus, Mr. Ridley argues, "[h]e certainly wasn't the four (4) black females identified in the attempt to locate." Finally, in his most creative argument, Mr. Ridley notes the drive-by occurred two nights before and "eight streets north and five streets west" of the checkpoint intersection, proving he was "coming from an altogether different location than that described in the attempt to locate." According to Mr. Ridley, these "facts" demonstrate

how the police bulletin could not possibly create a reasonable articulable suspicion to stop his Jeep.

Reality and the testimony suggest to the contrary. The officers were certainly aware of sufficient articulable facts showing a similarity between Mr. Ridley's vehicle and the one connected to the drive-by shooting to warrant a reasonable suspicion on their part. Two officers testified that because it was two o'clock in the morning they could not tell if the Jeep was black or brown. They did know it was a dark-colored, large model Jeep with woodgrain paneling. Although the report identified four females, one officer testified he believed the driver could have been associated with the suspects, or because of the size of the Jeep, a number of persons could have been hidden in the back. More importantly, as the district court noted, "given the difficulty of making an exact description of a vehicle and its occupants in a drive-by shooting, we believe the points of similarity in this instance provided one reasonable basis for suspicion." Reasonable suspicion does not have to be predicated upon an identity of facts, particularly in circumstances where the officers make their observations under conditions found here. Looking at the evidence in a light most favorable to the prosecution, we can see no error in the inferences drawn by the district court.

Mr. Ridley next argues the police could not have seen what they said they saw. He predicates his argument upon the contention that it was physically impossible for the officers to have seen what they claimed because of the time of night, the distance between

the cars, the speed of the Jeep, and the fact a Jeep sits up very high. He concludes "[t]he mere fact that Sgt. Haugen could have possibly seen anything inside the vehicle at 2:00 o'clock in the morning as it passed by his location ... at speed should certainly be subject to some scrutiny."

Yet, that is precisely what the district court did. It examined the testimony and concluded the officers saw some movement making them believe Mr. Ridley was possibly concealing something under the seat. We see no reason to disagree with this finding. Although we do not believe a "furtive" movement, standing alone, supports a ***Terry*** search, we think it is a factor to consider when examining reasonable suspicion. For instance, in its order denying the motion, the district court cited fourteen cases where courts have considered "furtive" movements as *a* factor supporting a finding of reasonable suspicion. *See, e.g.*, ***United States v. Moorefield***, 111 F.3d 10, 13 (3d Cir. 1997) (passenger's furtive movement factor supporting ***Terry*** search); ***United States v. Malone***, 49 F.3d 393, 397 (8th Cir. 1995) (same). Mr. Ridley's attempt to distinguish these cases misses the point. Each of these courts considered the "furtive" movement in its analysis -- as did this district court.

Finally, Mr. Ridley argues, "[i]t would seem to be perfectly natural for a cautious driver to slow his vehicle upon being confronted with a police road block only coming into view 150 feet before he had to come to a stop." That supposition, however, disagrees with the testimony in the record.

Sgt. Kevin Miller, a police officer since January 1983, was asked what seemed unusual to him about the defendant's abrupt slowing. He responded, "Most cars continue[d] their rate of speed until they got to the stop area and then they would stop at the stop sign that was present. And he just immediately applied the brakes and it --it was as if he wasn't going to stop."

Nonetheless, while slow speed in this instance may be indicative of innocent behavior as well as suspicious behavior, the court may consider it as a factor in its analysis. Indeed, defendant's contentions here really amount to nothing more than an attempt to have us reweigh the evidence upon which the district court based its ruling. That we cannot do.

Defendant makes one last point. He argues once he was removed from the vehicle the officers had no further need to search it for a weapon. In effect, he contends his dislocation from the potential place where a gun might be hidden eliminates any threat he might have posed to the officers. Yet, officers, such as those in this case, who have reasonable suspicion to believe a person in a vehicle may have possession of a weapon are entitled to a protective search of both the person and the passenger compartment of the vehicle. *Michigan*, 463 U.S. at 1049. The search in this matter did not exceed that authority.

Although the officers did not find a gun on Mr. Ridley's person, they still had reason to suspect one might have been in the vehicle. Indeed, it is evident from the

record the search of the Jeep was almost simultaneous with the removal of the defendant from the car. Under these circumstances, the concern for the officers' safety had not been eliminated when the search actually occurred. We see nothing improper about the protective search of the vehicle.

Reviewing the totality of the circumstances in this case, we believe the officers had a reasonable articulable suspicion to search the Jeep. They believed the Jeep fit the description of a vehicle used in a drive-by shooting two days before. The driver of the Jeep took the unusual action of braking the car when he saw the checkpoint. While driving slowly, the driver made a movement which the officers interpreted as "furtive" -- an attempt to hide something under the seat. The officers made each of these observations immediately known to other officers; they were not post hoc rationalizations, they were real time concerns. The district court did not err.

**AFFIRMED**.


ENTERED FOR THE COURT


John C. Porfilio
Circuit Judge