UNITED STATES of America,
Plaintiff,

v.

John Stephen IVEY, Defendant.

No. 2:03–CR–103 W.

United States District Court,
D. Utah,
Central Division.

March 8, 2004.

Richard D. McKelvie, Salt Lake City, UT, for Plaintiff.

Stephen R. McCaughey, Salt Lake City, UT, for Defendant.

## MEMORANDUM DECISION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

WINDER, Senior District Judge.

This matter is before the court on Defendant's Motion to Suppress. On November 5, 2003, the court conducted an evidentiary hearing on the motion. Defendant John Stephen Ivey ("Ivey") was present with his counsel, Stephen R. McCaughey. The government was represented by Richard D. McKelvie. Following the hearing, the court ordered a transcript as well as supplemental briefing from the parties. On February 24, 2004, the court heard oral argument on the matter. After thorough review and consideration of the pleadings submitted by the parties, the testimony presented at the evidentiary hearing on the motion to suppress, and the arguments of counsel, the court enters the following memorandum decision and order.

### BACKGROUND

The court finds the relevant facts as follows.[1] On January 29, 2003, Charles Taylor, a Trooper with the Arizona Highway Patrol, was on duty on Highway 191 just south of the Utah border. (Tr. at 9–10.) At approximately 4:00 p.m. he observed a white Dodge pickup traveling northbound at 72 miles per hour, approximately 17 miles per hour over the posted 55 mile per hour speed limit. (Tr. at 10.) Because the vehicle was speeding, Trooper Taylor initiated a traffic stop.

Upon stopping the vehicle, Trooper Taylor requested a driver's license, registration and proof of insurance. The defendant provided the requested documents and Trooper Taylor determined that the driver and sole occupant of the vehicle was the defendant, John Ivey. (Tr. at 13.) Trooper Taylor ran the vehicle's registration, and the registered owner came back as John Ivey.

During the course of his investigation for speeding, Trooper Taylor made several observations which raised his suspicions that the defendant might be involved in illegal activity. Trooper Taylor noted that the defendant had approximately $800 in cash in his pocket. (Tr. at 14.) The truck appeared to him to be overly loaded for the stated duration of the defendant's trip. (Tr. at 16.) Further, he suspected that the defendant was being dishonest about his destination and the purpose of his travel plans. (Tr. at 15.) After issuing a warning citation and returning the defendant's documents, Trooper Taylor requested permission to search the vehicle. The defendant declined to consent to the search, and was allowed to leave. (Tr. at 17–19.)

After the defendant departed, traveling northbound toward Utah, Trooper Taylor

---

1. Reference to the transcript of the evidentiary hearing conducted on November 5, 2003, will be cited as "Tr. at ___."

contacted the San Juan County, Utah Sheriff's Office dispatcher and advised her about the stop. Trooper Taylor gave a description of the truck and indicated his belief that it was heading to San Juan County. (Tr. at 20–21.) Trooper Taylor told the dispatcher that he had stopped the truck, that he had seen "criminal indicators," and that he had been refused consent to search the vehicle. Trooper Taylor did not specifically identify the "indicators" he observed. (Tr. at 29–30.)

Utah Highway Patrol Trooper Glen Begay was on patrol in San Juan County when he overheard a general dispatch broadcasting information about Trooper Taylor's stop of the defendant. San Juan County dispatch indicated that Trooper Taylor had stopped a vehicle and that he believed it was suspicious. (Tr. at 70.) Trooper Begay testified that he thought he remembered dispatch broadcasting the code 10–35, which is a "possible criminal interdiction." (Tr. at 42.) Dispatch reported that the vehicle was a white, extended cab Dodge pickup with a camper shell and Colorado plates. (Tr. at 41.) Trooper Begay was not informed that a request for consent to search was refused. (Tr. at 42, 55–56.) Shortly thereafter, Trooper Begay was stationary off the side of Highway 191, facing south, when he observed the defendant's truck approaching northbound. As the defendant passed, Begay noted that instead of the typical passing glance given by most motorists, the defendant appeared to stare or give a "constant direct look" at him, even to the point of distracting the defendant from his driving. (Tr. at 43–44) Through his rearview mirror, Trooper Begay then observed the vehicle swerve and weave. (Tr. at 43–44.)

Trooper Begay decided to follow the vehicle in an effort to determine if the operator was driving safely or if he might be fatigued or otherwise impaired. (Tr. at 45, 78.) After catching up with the vehicle, Begay observed the vehicle cross the center line approximately five times, in violation of state law. (Tr. at 46.) Trooper Begay determined at that time that he would stop the vehicle. However, because the area in which they were driving had many hills and a narrow road, for safety purposes Trooper Begay continued to follow the defendant for a few miles before initiating the stop in a wide open area. (Tr. at 46–47, 78.) When Trooper Begay stopped the vehicle, he asked dispatch to contact Trooper and canine handler Sanford Randall. Trooper Begay called for Trooper Randall because of the earlier information he had received about possible criminal activity. (Tr. at 60.)

Trooper Begay made several observations as he approached the vehicle. The first and most significant observation dealt with the configuration of the truck bed. Begay noted that the truck had a camper shell, and that the entire cargo area was covered from side to side, front to back, with some type of platform or partition. (Tr. at 47.) Trooper Begay testified that he had observed this unusual configuration only one other time, a few months earlier, during a traffic stop and vehicle search by Sgt. Eldredge. In that case, the bottom portion of the unusual cargo area was being used to transport and conceal a large quantity of marijuana. (Tr. at 48.)

Trooper Begay also noticed a United States flag sticker on the window, an item that he has been trained to recognize as a possible "disclaimer" of criminal activity. (Tr. at 49.) As he approached the cab of the truck, he encountered a "very strong"

odor of air freshener,[2] which is often used to mask the odor of narcotics. (Tr. at 50.) He also noticed luggage in the back seat of the vehicle, which he believed may have been put there in order to reserve more room in the truck bed for contraband. (Tr. at 51.)

Upon making contact with the defendant, Trooper Begay requested his driver's license, registration and proof of insurance. (Tr. at 51.) Begay testified that the defendant exhibited extreme nervousness and that he was shaking so violently he needed to use both hands when presenting his license, steadying one hand with the other. (Tr. at 51–52.) Begay also testified that in his experience drivers often exhibit nervousness at the time of the initial encounter, but that nervousness dissipates over the course of the stop. However, the defendant's nervousness continued during the stop, in a manner consistent with Begay's experiences with individuals who are engaged in other criminal activity. (Tr. at 52–54.)

While the defendant was looking for his registration, Begay asked him about his travel history and destination. Begay was suspicious of the defendant's answers because he thought they were vague and cursory. After some difficulty, the defendant located the vehicle registration in the front pocket of his pants. (Tr. at 55.)

Trooper Begay then asked the defendant to come back to his police vehicle and the defendant complied. (Tr. at 56.) While inside Begay's patrol vehicle, Begay discussed the driving pattern he had observed, and the defendant indicated he was tired and was planning to spend the night in Monticello or Moab. (Tr. at 57.) In an attempt to understand the defendant's extreme nervousness, Trooper Begay asked the defendant if he felt intimidated. According to Begay, the defendant responded that he thought Begay was "pretty professional" in the way he was interacting with him. (Tr. at 57.)

Trooper Begay issued the defendant a warning citation for the improper lane travel and returned the defendant's license and registration. He then confronted the defendant, indicating that he perceived some inconsistencies in the defendant's travel plans. (Tr. at 58.) He asked if there were any controlled substances in the vehicle, and specifically asked about cocaine, methamphetamine, heroin, and marijuana. The defendant denied possession of any of those items, but Trooper Begay observed a change in the defendant's demeanor when he asked about marijuana. Specifically, Begay noted that the defendant looked straight forward when answering about marijuana, whereas he had looked straight at Begay while answering the other questions. (Tr. at 59.) Begay's experience caused him to believe the defendant was being deceptive. (Tr. at 59–60.)

At about this time, Trooper Randall arrived on the scene with his canine. Trooper Begay asked the defendant if he would mind if the canine sniffed his truck. (Tr. at 61.) The defendant said he would not allow it. (Tr. at 61.)

Trooper Randall had been contacted by dispatch at the time of the initial stop, and arrived at the location within about ten minutes. (Tr. at 103.) Before ever speaking to Trooper Begay, Trooper Randall made the same observations about the un-

---

**2.** Trooper Begay testified that in conducting their investigation, and after searching the vehicle, they located "numerous tree air fresheners in the vehicle." (Tr. at 50.)

usual configuration of the truck bed. (Tr. at 106.) Trooper Randall similarly noted that the only other time he had seen a truck bed configuration identical to this one, the truck had been hauling a large quantity of marijuana. (Tr. at 105, 106.)

Trooper Begay briefly related what he had observed to Randall, and asked Randall to expose his dog to the truck to determine if the dog would alert to the presence of a controlled substance. During this time, the defendant repeatedly expressed interest in leaving the scene, and he specifically asked Trooper Begay if he was free to leave. (Tr. at 60–61.) The troopers told the defendant that they had reasonable suspicion that the vehicle contained contraband, and that the vehicle would be detained long enough to expose the dog to it. The defendant was informed that he was free to go, but the vehicle was not. (Tr. at 61–62.)

No more than five minutes after Trooper Randall arrived at the location, he exposed the dog to the truck and it quickly alerted to the rear portion of the vehicle, indicating the presence of a controlled substance. (Tr. at 62, 109, 121.) At that point, the troopers advised the defendant that they had probable cause to search the vehicle, and they asked him to provide the key. (Tr. at 62.) The defendant approached the cab of the truck and entered as though he were going to retrieve the keys. (Tr. at 63, 109.) Trooper Randall followed. However, rather than retrieve the keys, the defendant suddenly pulled himself into the cab and started the vehicle, while hitting Trooper Randall with an elbow in an effort to flee. (Tr. at 62–63, 110.) With the defendant at the wheel and Trooper Randall hanging on through the open door, the vehicle careened across the highway and into an open area where salt and gravel are stored. Ultimately, Trooper Randall was able to pull the defendant from the moving vehicle onto the ground, where Randall and Begay were able to subdue him after a brief struggle. (Tr. at 64–65, 110.) The troopers then approached the vehicle, which had traveled down an incline and into a ravine where it ultimately stopped. They could smell a strong odor of marijuana, and upon opening the tailgate observed several duffel bags containing marijuana. (Tr. at 67–68, 111–12.)

Trooper Begay testified that in situations where an individual involved in a traffic stop attempts to flee, in the manner described in this case, the individual would be arrested. As a result of that arrest, the vehicle would be impounded and inventoried according to the policy of the Utah Highway Patrol. (Tr. at 68–69.)

## DISCUSSION

A routine traffic stop is a seizure within the meaning of the Fourth Amendment. *United States v. Botero–Ospina*, 71 F.3d 783, 786 (10th Cir.1995), *cert. denied*, 518 U.S. 1007, 116 S.Ct. 2529, 135 L.Ed.2d 1052 (1996). The reasonableness of such a stop is reviewed under a two-part test set forth in *Terry v. Ohio*, 392 U.S. 1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Under that test, the court must make a dual inquiry asking first whether the officer's action was justified at its inception and second whether it was reasonably related in scope to the circumstances which justified the interference in the first place. *United States v. Williams*, 271 F.3d 1262, 1266 (10th Cir.2001), *cert. denied*, 535 U.S. 1019, 122 S.Ct. 1610, 152 L.Ed.2d 624 (2002).

### I. *The Initial Stop of Defendant's Vehicle*

A traffic stop "is reasonable under the Fourth Amendment at its inception if

the officer has either (1) probable cause to believe a traffic violation has occurred or (2) a reasonable articulable suspicion that 'this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction.'" *United States v. Ramstad*, 308 F.3d 1139, 1144 (10th Cir.2002) (quoting *United States v. Ozbirn*, 189 F.3d 1194, 1197 (10th Cir.1999)). It is irrelevant whether the particular officer would have stopped the vehicle under the general practice of the police department or whether the officer may have had other subjective motives for stopping the vehicle. *United States v. McRae*, 81 F.3d 1528, 1533 (10th Cir.1996).

■ In this case, Trooper Begay's undisputed testimony was that he observed the defendant's vehicle violate Utah law. Trooper Begay testified that after seeing the defendant's vehicle pass his location, he continued to observe the vehicle through his rear-view mirrors, and he saw the vehicle swerve and weave. Trooper Begay further testified that after pulling onto the highway and catching up with the defendant's vehicle, he observed the vehicle cross the center line approximately five times. Trooper Begay testified that based on these observations he believed the driver of the vehicle might be impaired or tired. Section 41–6–61(1) of the Utah Code provides: "A vehicle shall be operated as nearly as practical entirely within a single lane and may not be moved from the lane until the operator has determined the movement can be made safely."

Given the repeated instances of weaving and crossing the center line and Trooper Begay's concerns that the driver might be impaired, the court concludes that Trooper Begay had reasonable articulable suspicion to believe a traffic violation had occurred. Accordingly, the stop of the defendant's vehicle was justified at its inception.[3]

## II.  *The Detention*

Having determined that the traffic stop of defendant's vehicle was justified at its inception, the court must ask "whether the

---

**3.** The defendant contends that Begay's testimony lacked credibility, and therefore the basis for the stop should be questioned. Defendant suggests that it is "highly implausible" that a person who, as Begay testified, was extremely nervous throughout the encounter would stare at the trooper as he passed. Defendant claims that it is more likely that a person transporting large quantities of drugs would try to be *less* conspicuous, and avoid prolonged eye contact with an officer. Similarly, the defendant claims that it is highly unlikely that the defendant would have driven his vehicle in the manner described by Begay, permitting it to swerve and weave across traffic lines numerous times, when the defendant was aware that he was being followed by an officer.

While recognizing certain discrepancies in the testimony of the officers, most notably with regard to the temperature on the day in question, the court is of the opinion that Trooper Begay's testimony was not unreliable. More specifically, Trooper Begay's testimony concerning the traffic stop was neither inconsistent nor inconceivable. As previously noted, Trooper Begay testified that the defendant was incredibly nervous, and nervous to the extent that he needed the use of both hands to deliver his driving documents. This nervousness and anxiety would not be unexpected as the defendant had already been stopped by a trooper in Arizona who had asked the defendant for permission to search his vehicle. The defendant's "fixation" on Trooper Begay could have been the result of the defendant's surprise and obvious concern upon seeing another trooper observing him. Finally, the defendant's awareness that Trooper Begay was following him could certainly have distracted the defendant and created a level of anxiety that would have affected his driving.

officer's actions during the detention were reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 20, 88 S.Ct. 1868. The Supreme Court has made clear that "an investigative detention must be temporary, lasting no longer than necessary to effectuate the purpose of the stop, and the scope of the detention must be carefully tailored to its underlying justification." *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).

■ "An officer conducting a routine traffic stop may run computer checks on the driver's license, the vehicle registration papers, and on whether the driver has any outstanding warrants or the vehicle has been reported stolen." *United States v. Mendez*, 118 F.3d 1426, 1429 (10th Cir. 1997). "The officer may detain the driver and his vehicle as long as reasonably necessary to make these determinations and to issue a citation or warning." *United States v. Wood*, 106 F.3d 942, 945 (10th Cir.1997); *United States v. Martinez*, 983 F.2d 968, 974 (10th Cir.1992), *cert. denied*, 507 U.S. 1056, 113 S.Ct. 1959, 123 L.Ed.2d 662 (1993). However, once the computer checks confirm that the driver has produced a valid license and proof of entitlement to operate the car, the driver must be permitted to proceed on his way, without further delay by police for additional questioning. *United States v. Anderson*, 114 F.3d 1059, 1063–64 (10th Cir.1997). Any subsequent or concurrent detention for questioning must be supported by a reasonable suspicion of criminal activity. *United States v. Jones*, 44 F.3d 860, 872 (10th Cir.1995); *United States v. Villa–Chaparro*, 115 F.3d 797, 801–02 (10th Cir.) ("An investigative detention may be expanded beyond its original purpose ... if during the initial stop the detaining officer

acquires reasonable suspicion of criminal activity, that is to say the officer must acquire a particularized and objective basis for suspecting the particular person stopped of criminal activity."), *cert. denied*, 522 U.S. 926, 118 S.Ct. 326, 139 L.Ed.2d 252 (1997).

■ The standard for evaluating whether an officer could have had a reasonable suspicion of illegal activity is an objective one. *See Villa–Chaparro*, 115 F.3d at 802. Whether the subsequent detention is supported by reasonable suspicion of illegal activity does not depend upon any one factor but on the totality of the circumstances. *Jones*, 44 F.3d at 872; *United States v. Soto*, 988 F.2d 1548, 1555 (10th Cir.1993). By definition, the totality of the circumstances includes all circumstances known to the officer at the time, as well as reasonable inferences and conclusions that may be drawn by the officer. Moreover, in determining reasonableness, the officer's conduct should be viewed with " 'common sense' considering 'ordinary human experience.' " *Villa–Chaparro*, 115 F.3d at 801 (quoting *United States v. Sharpe*, 470 U.S. 675, 685, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985)).

■ After careful review and consideration of the facts in this case, the court concludes Trooper Begay's detention of the defendant was reasonable in light of the totality of the circumstances present in this case. More specifically, although Trooper Begay's investigation of the defendant began with the observed offense of improper lane travel, he was confronted almost immediately with additional factors which justified the brief detention which occurred after Trooper Begay returned the defendant's documents and issued the warning citation.

Upon approaching the vehicle following the stop, and before making contact with the defendant, Trooper Begay made observations regarding the unusual configuration of the truck bed and camper shell. Trooper Begay immediately noted the unusual platform in the truck bed and found this to be highly significant. (Tr. at 47.) Trooper Begay testified that the unusual configuration "aroused his suspicions" because, as a law enforcement officer with seven years of experience, he had only seen one other truck configured in such a manner, and in that case the vehicle had contained a large quantity of marijuana. (Tr. at 47–48.)

Upon reaching the passenger compartment of the truck, Trooper Begay noted a "very strong" odor of air-freshener. Begay testified that in his training and experience, air freshener is often used to mask the odor of narcotics in a vehicle. (Tr. at 50.) See United States v. Salzano, 158 F.3d 1107, 1114 (10th Cir.1998) (recognizing that a strong odor of air freshener may give rise to a reasonable suspicion on the part of law enforcement officials that the odor is being used to mask the smell of drugs); United States v. Villa–Chaparro, 115 F.3d 797, 802 (10th Cir.1997) ("Although the scent of a masking agent alone is insufficient to establish reasonable suspicion, we have repeatedly held that air freshener coupled with other indicia of criminal activity supports a reasonable brief inquiry."). In addition, Trooper Begay noted two U.S. flag stickers, which through training and experience, he recognized as possible "disclaimers" or camouflage to relieve suspicion. He also observed that the defendant had his luggage in the rear seat of the passenger compartment rather than the cargo area of the truck bed. Trooper Begay testified that he has learned from both his training and

experience that people may carry luggage in the back seat of their vehicle so that they have more room in concealed areas to transport narcotics. (Tr. at 51.) These facts also contributed to Trooper Begay's suspicions.

Finally, Trooper Begay testified that the defendant appeared extremely nervous. The Tenth Circuit has cautioned that nervousness is of "limited significance" in determining whether reasonable suspicion exists. See United States v. Wald, 216 F.3d 1222, 1227 (10th Cir.2000). However, "extreme and continued nervousness is entitled to somewhat more weight." United States v. Williams, 271 F.3d 1262, 1268 (10th Cir.2001) (quoting United States v. West, 219 F.3d 1171, 1179 (10th Cir.2000)). In this case, Trooper Begay provided specific testimony detailing the nervousness of the defendant. For example, Trooper Begay testified that the defendant's shaking was "extreme." (Tr. at 51.) Trooper Begay explained how the defendant had to use both hands-using one hand to stabilize the other-in order to give Trooper Begay his driver's license. (Tr. at 51.) Although he acknowledged that most motorists exhibit some degree of nervousness when they are approached by an officer in this kind of situation, Trooper Begay testified that in routine traffic stops, during the course of conversation, the nervousness diminishes. (Tr. at 52.) Trooper Begay testified that in this case, as has been true in other cases where the driver had "something to hide," the driver's nervousness did not dissipate. Trooper Begay testified that the defendant's nervousness actually escalated as the traffic stop continued. (Tr. at 53.) While recognizing that "[n]ervousness alone cannot support reasonable suspicion of criminal activity," United States v. Salzano, 158 F.3d 1107, 1113 (10th Cir.1998), the defendant's nervous-

ness in this case exceeded that of the average citizen during a routine traffic stop and contributed to Trooper Begay's reasonable suspicion of criminal activity. *See Williams*, 271 F.3d at 1269 (upholding district court's finding that defendant's "nervousness exceeded that of the average citizen during a routine traffic stop" because defendant's "nervousness did not dissipate throughout the entire stop"); *United States v. Soto*, 988 F.2d 1548, 1556 & n. 4 (10th Cir.1993) (providing that extreme nervousness, when combined with other factors, can be a basis for reasonable suspicion).

Although the presence of U.S. flag stickers as well as the defendant's decision to transport his luggage in the back seat rather than the cargo area may have questionable persuasive value standing alone, when combined with the highly unusual configuration of the defendant's truck bed, his extreme nervousness, and the "very strong" odor of air-freshener, the totality of these circumstances adequately supports reasonable suspicion.

█ Finally, the court finds it significant that the duration of the continued detention of the defendant was brief and was not unreasonable in light of the facts. In this case, the defendant was detained for only a few minutes beyond the time necessary to conclude the traffic investigation and issue a warning citation. Trooper Begay testified that he had dispatch contact Trooper Randall when he initially stopped defendant's vehicle. Trooper Randall testified that it took him no more than ten minutes to reach the location, during which time Trooper Begay was investigating the lane violation. (Tr. at 103, 113.) Trooper Begay testified that Trooper Randall arrived just as he was returning the defendant's documents and issuing the warning citation. Accordingly, the time period of the detention that was unrelated to the initial traffic stop was the amount of time that elapsed from Trooper Randall's arrival at the location and the dog's "alert" to the defendant's truck.

█ Trooper Randall testified that from the time he arrived at the scene until the dog was deployed to the defendant's vehicle was "no more than five minutes." (Tr. at 120.) Trooper Randall explained that upon reaching the scene, he had a brief conversation with Trooper Begay and he let his dog out to "have a break for just a minute" before directing the dog to the vehicle. Trooper Randall repeatedly testified that the entirety of his conversation with Trooper Begay combined with the dog's "break" "would have been less than five minutes." Once the dog was deployed to the vehicle, the dog almost immediately alerted to the truck, indicating the presence of a controlled substance.[4] In sum, approximately ten minutes elapsed from the time of the initial stop until the time that the defendant's documents were returned, he was issued a warning citation, and the drug detection dog arrived. Thereafter, approximately five additional minutes elapsed before the drug dog alerted to the defendant's truck. In the presence of reasonable suspicion, this period of detention was not unreasonable. *See Williams*, 271 F.3d at 1262, 1271 (10th Cir.2001) (providing that detention at conclusion of traffic stop for 15 minutes awaiting the arrival of drug detection dog was

---

4. An alert by a trained narcotics-detecting dog is sufficient, without more, to establish probable cause for a search. *United States v. Ludwig*, 10 F.3d 1523, 1527 (10th Cir.1994).

Trooper Randall testified that he and his canine had been trained and certified in September, 2002, and engaged in ongoing training each week. (Tr. at 98–101.)

not unreasonable in the presence of reasonable suspicion of drug activity).

### III. Intervening Action by Defendant

 Moreover, even if this court had concluded that the detention of the defendant had been unlawful, the unlawful detention would not necessarily have resulted in the suppression of the evidence in this case. When a defendant commits a new and distinct crime in the presence of the officers, even if it is in response to official misconduct, evidence of that crime and evidence found as a result of that crime may be admissible. *See United States v. Waupekenay,* 973 F.2d 1533, 1537 (10th Cir.1992) (discussing and citing *United States v. Bailey,* 691 F.2d 1009, 1017 (11th Cir.1982) (evidence should not be suppressed when the defendant commits a new and distinct crime in response to illegal police conduct))[5]; *see also State v. Gardiner,* 814 P.2d 568 (Utah 1991) (defendant who punched a police officer and fought with him after the officer informed him that he was under arrest was properly convicted of interfering with a police officer, the fact that the officer's underlying reason for being on the defendant's property was illegal did not justify the attack on the officer).

 In this case, the defendant's actions in assaulting Trooper Randall and attempting to flee provided the officers with an independent basis upon which to arrest the defendant, impound the vehicle, and inventory the vehicle pursuant to the impound.

Therefore, based on the foregoing and good cause appearing, IT IS HEREBY ORDERED that defendant's motion to suppress is DENIED.

---

5. The Tenth Circuit stated that their decision was "consistent with the holdings of many other courts, state and federal, that have considered situations in which a defendant seeks to suppress evidence relating to his or her violence or threatened violence toward police officers subsequent to an unlawful search or seizure or warrantless entry. In assault, resisting arrest, disorderly conduct, and weapons related trials, these courts have uniformly rejected motions to suppress arising from skirmishes comparable to the one at issue in the instant case." *Id.* at (1537) (listing numerous cases and treatises).

Although *Waupekenay* dealt with an expectation of privacy issue, the Tenth Circuit recognized that many courts have reached the same conclusion based on "somewhat different reasoning." The court explained:

Some courts have found the intervening act of the defendant to be so separate and distinct from the illegal entry or arrest as to break the causal chain. Other courts have stressed the limited objective of the exclusionary rule, i.e., deterring unlawful police conduct-and the strong public interest in preventing and punishing force or threats of force directed against police officers.... However, whatever rationale is used, the result is the same: *Evidence of a separate, independent crime initiated against police officers in their presence after an illegal entry or arrest will not be suppressed under the . Fourth Amendment.*
*Id.* at 1538 (citations omitted, emphasis added).